ANTONIO E. GRILLO, recurrente, *v.* EL REGISTRADOR DE LA PROPIEDAD DE CAGUAS, recurrido.

Núm. 1130.—*Sometido:* Noviembre 1, 1943. *Resuelto:* Diciembre 7, 1943.

*Andrés Mena Latorre,* abogado del recurrente; el registrador recurrido compareció por escrito.

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

Martina García Reyes, dueña de una finca rústica que radica en Caguas, la vendió al recurrente Antonio E. Grillo en 30 de julio de 1927 por el precio de $4,000 que el comprador conservó en su poder en calidad de préstamo, con intereses a razón de $22 mensuales, comprometiéndose a satisfacer dichos $22 a la vendedora mientras viviera y que asimismo al fallecer Martina García Reyes continuaría recibiendo dichos intereses, también durante su vida, Carmen García Reyes, hermana de la vendedora. Para garantizar el capital de $4,000 y los intereses Grillo constituyó primera hipoteca sobre la finca vendida. Bajo testamento otorgado el 6 de marzo de 1929 Martina García Reyes instituyó como su única y universal heredera a su hermana Carmen y nombró como albacea, contador partidor, al recurrente Antonio E. Grillo. Martina García Reyes falleció el 10 de febrero de 1932 y el 15 de marzo del mismo año su heredera Car-

men García Reyes por escritura núm. 86 sobre "Contrato de Renta Vitalicia", otorgada ante el notario Andrés Mena Latorre, cedió al recurrente Grillo y su esposa el crédito hipotecario que había heredado y en pago de dicha cesión el Sr. Grillo y su esposa se comprometieron a pagar a la cedente durante toda su vida una renta vitalicia, también de $22 mensuales, y para garantizar el pago de la misma, constituyeron hipoteca voluntaria sobre la finca a favor de la cedente, la cual hipoteca se cancelaría al fallecimiento de la pensionista, con sólo pedirlo los hipotecantes, sus sucesores o causahabientes por escrito y "sin necesidad de acreditar el pago de todas las pensiones devengadas durante la vida de ésta, pues si alguna o algunas hubiesen sin solventar, desde ahora la pensionista las condona y hace gracia de su importe a los hipotecantes y a sus sucesores o causahabientes, aceptando los hipotecantes tal liberalidad que de veras agradecen."

Inscrito el crédito hipotecario original a favor de Carmen García Reyes, se presentó al Registrador de la Propiedad de Caguas para su inscripción la referida escritura núm. 86 de 15 de marzo de 1932 y el registrador se negó a inscribir a virtud de la siguiente nota:

"DENEGADA la inscripción del precedente documento, por resultar de la Anotación preventiva letra E practicada sobre esta finca al folio ciento cuarenta y siete vuelto del tomo ciento veintidós de Caguas, que según la escritura número ciento cuarenta y nueve, otorgada en Caguas, en ocho de abril del corriente año, mil novecientos cuarenta y tres, ante el notario Andrés Mena Latorre, doña Carmen García Reyes diciendo ser dueña a título hereditario de un crédito hipotecario que grava esta finca por la suma de cuatro mil dólares, lo cancela por haber recibido del deudor Antonio E. Grillo Santiago la referida cantidad en la forma siguiente: Tres mil ciento sesenta y ocho dólares en partidas mensuales de a veintidós dólares cada una a contar desde el día quince de marzo de mil novecientos treinta y dos, y el resto de ochocientos treinta y dos dólares en la fecha de la escritura esa anotación preventiva se tomó por no hallarse previamente inscrito el crédito a favor de la acreedora: que por la escritura

número ochenta y seis de fecha quince de marzo de mil novecientos treinta y dos, otorgada ante el propio notario señor Mena, que es el documento ahora presentado, don Antonio Grillo Santiago, diciéndose también dueño del mismo crédito hipotecario de cuatro mil dólares por título de cesión y traspaso que del mismo le hiciera la mencionada Carmen García Reyes a cambio de una renta vitalicia de veintidós dólares mensuales, canceló el referido crédito hipotecario por confusión de derechos como acreedor y dueño; y resultando que tal incongruencia entre los dos documentos establece serias dudas en cuanto a la validez y legalidad de los actos en ellos consignados que pueden envolver una cuestión de fraude cuya resolución compete a los tribunales, tomándose en su lugar anotación preventiva por ciento veinte días a favor de Antonio E. Grillo en cuanto a la cesión y a favor de Carmen García Reyes en cuanto a la hipoteca, al folio 249 vto. del tomo 122 de Caguas, finca 352, anotación letra F. Caguas, a 13 de septiembre de 1943.''

La escritura núm. 149, otorgada el 8 de abril de 1943, a que hace referencia el Registrador en su nota ha sido acompañada por el recurrente con su escrito inicial ante esta Corte.

Es realmente contradictoria la situación que presentan las escrituras otorgadas en 1932 y 1943. Según la anotación preventiva E, que se refiere a la núm. 149 de 1943, Carmen García Reyes cancelaba el crédito hipotecario de $4,000 por haber recibido su importe, mientras que de la núm. 86 de 1932 aparece que ya el recurrente Sr. Grillo lo había cancelado y es por esto que el Registrador hace constar que tiene "serias dudas en cuanto a la validez y legalidad de los actos" consignados en las dos escrituras "que pueden envolver . . . fraude cuya resolución compete a los tribunales". Sin embargo, creemos que el recurrente tiene razón cuando sostiene que la única escritura que el registrador tenía ante su consideración es la núm. 86 de 1932 pues en cuanto a la núm. 149 de 1943 se denegó su inscripción y esta denegación fué consentida por haber expirado en exceso los 120 días de la anotación preventiva antes de presentarse al registro la de 1932.

El Registrador para denegar la inscripción de la escritura núm. 86 de 1932 se funda en el artículo 79 del Reglamento a la Ley Hipotecaria que dispone:

"Artículo 79.—Los registradores, no solamente negarán la inscripción de todo título que contenga faltas que la impidan, tomando o no anotación preventiva, según corresponda, sino que cuando resultare del mismo título haberse cometido algún delito, darán parte a la correspondiente autoridad judicial, remitiéndole el documento donde resulte.''

En su alegato el Registrador sostiene que no cree que de acuerdo con el artículo 79, supra, debió remitir el documento a la autoridad judicial, pues si ''su calificación es suficiente denegando la inscripción de un título para detener en el Registro el proceso de cualquier acto que infrinja la ley, mejor es dejar a los tribunales el ejercicio de su jurisdicción en bien de la justicia.''

Una mera lectura del artículo 79, supra, demuestra que no es aplicable a los hechos de este caso y que de serlo el Registrador no cumplió con sus preceptos. Del contenido del documento presentado en el Registro no aparece que se haya cometido algún delito y si así fuere, la actuación del Registrador debió haber sido otra, es decir, negar su inscripción y remitirlo a la autoridad judicial correspondiente, el Fiscal de Distrito, dejando constancia de lo actuado en nota al margen del asiento de presentación. Este es el procedimiento que señalan los comentaristas:

Dice Morell, volumen 2, página 251:

"Ahora bien, si resultare del mismo título haberse cometido algún delito, el Registrador debe ponerlo en conocimiento de la Autoridad judicial correspondiente remitiéndole el documento respectivo, y hacer constar esta circunstancia de la remisión y su causa por nota al margen del asiento de presentación. Este precepto, contenido en el art. 79 del Reglamento, será de rarísima aplicación por no ser natural, como dice Escosura, que los que se proponen cometer un delito procedan de manera que resulte así del mismo título.''

Al mismo efecto Galindo y Escosura, volumen 2, página 17, se expresan en esta forma:

"Raro será el caso en que tenga aplicación el precepto del art. 58 del Reglamento. Los que se proponen cometer un delito, ya procuran que no resulte del mismo título; y como terminantemente dice el art. 18 de la Ley, que la calificación ha de hacerse por lo que resulte de las escrituras, así también el 58 del Reglamento, limita el deber que impone al Registrador de dar parte a la Autoridad judicial con remisión del documento, al caso en que del mismo título resultare que se había cometido algún delito."

Si lo anteriormente expuesto fuera lo único envuelto en el caso nos veríamos precisados a revocar la nota recurrida; pero en su alegato el Registrador entra en otras consideraciones, no consignadas en su nota denegatoria, para sostener su actuación, arguyendo, en parte, que la cesión del crédito hipotecario hecha por Carmen García Reyes a favor del recurrente es un contrato inexistente por falta de causa (art. 1213 del Código Civil) por no haber pagado el deudor nada como precio de la cesión, y además, que habiendo Martina García Reyes en su testamento nombrado albacea, contador partidor al recurrente, que a su vez era deudor del crédito hipotecario que heredó Carmen García Reyes, al adquirir dicho recurrente por cesión de la heredera el referido crédito, que constituía la herencia de la causante, infringió el artículo 1348 del Código Civil.

Hemos resuelto que no es en el alegato donde el Registrador debe consignar los motivos legales de su resolución, sino que es deber suyo expresar al pie del documento clara y concisamente dichos motivos, *Machuca e Hijos & Co.* v. *Registrador,* 22 D.P.R. 755; *Graciani* v. *Registrador,* 25 D.P.R. 44; *United Firemen's Ins. Co.* v. *Registrador,* 45 D.P.R. 591, y *Valentín* v. *Registrador,* 61 D.P.R. 218. En algunos de dichos casos esta Corte consideró en todos sus aspectos las cuestiones planteadas y confirmó las notas recurridas, debido a que existían circunstancias especiales envueltas en el asunto que así lo ameritaban. Creemos que en

el presente también estamos justificados en hacerlo pues el recurrente solicitó permiso para radicar y radicó un alegato de réplica al del Registrador en el que discute las cuestiones sometidas.

De los hechos consignados en el Registro aparece que Carmen García Reyes era dueña de un crédito hipotecario de $4,000 que heredó de su hermana Martina y esa hipoteca devengaba intereses de $22 mensuales durante toda su vida, venciendo la hipoteca al fallecimiento de doña Carmen. Empero, de acuerdo con la escritura objeto de este recurso Carmen García Reyes le cede a su deudor hipotecario, que al mismo tiempo es albacea del único bien hereditario dejado por la causante, el crédito que le pertenece y accede a que su deudor le pague $22 mensuales como renta vitalicia o sea la misma cantidad que estaba obligado a pagarle por concepto de intereses, y se cancela la hipoteca por confusión de derechos en el recurrente quien constituye nueva hipoteca sobre la finca para garantizar únicamente la renta vitalicia de $22 mensuales. Es condición de esta última hipoteca que se cancelará a la muerte de Carmen García Reyes y que cualquier pensión que el recurrente hubiere dejado de pagar la pensionista se la condona por adelantado.

De manera que el recurrente lo que ha hecho es comprometerse a pagar $22 mensuales a Carmen García Reyes como renta vitalicia mientras que anteriormente tenía la obligación de pagar esa misma cantidad de $22, también vitaliciamente, pero por concepto de intereses de la hipoteca de $4,000. Bajo el nuevo contrato, sin embargo—y esto es lo fundamental en este caso—, el recurrente no tiene que pagar el capital de $4,000 de la hipoteca al ocurrir la muerte de Carmen García Reyes.

El artículo 1702 del Código Civil establece que "El contrato aleatorio de renta vitalicia obliga al deudor a pagar una pensión o rédito anual durante la vida de una o más personas determinadas por un capital en bienes muebles o

inmuebles, cuyo dominio se le transfiere desde luego con la carga de la pensión.'' En el caso de autos el capital cuyo dominio se transfiere al recurrente no es la finca, pues ésta le pertenece desde el año 1927 en que la compró a la causante de Carmen García Reyes. El capital que se transfiere lo constituye el crédito hipotecario de $4,000 y el deudor asume la responsabilidad de seguir pagando los mismos $22 en concepto de pensión vitalicia. Asumiendo, sin resolverlo, que la causa del contrato sea la mera liberalidad de la acreedora, según sostiene el recurrente, ¿pudo éste, siendo albacea, adquirir dicho crédito? Es cierto que en la escritura él no comparece como tal albacea pero en la inscripción quinta de la finca que es en la que se inscribió el crédito hipotecario a favor de doña Carmen como heredera de su hermana doña Martina, sí se hizo constar que el recurrente había sido nombrado albacea testamentario de esta última.

El artículo 1348 del Código Civil dispone, en parte, que: ''No podrán adquirir por compra, aunque sea en subasta pública o judicial, por sí ni por persona alguna intermediaria: . . . 3. Los albaceas, los bienes confiados a su cargo.''

En el caso de autos del Registro aparece no sólo que el recurrente era el albacea de los bienes dejados por Martina García Reyes, sino que el único bien dejado por la testadora era el crédito hipotecario del cual era deudor el propio recurrente y que por lo tanto tenía en su poder dicho bien. Podrá argüirse que no se trata de un contrato de compraventa propiamente dicho, pero sostiene Manresa que el contrato de renta vitalicia, si el capital entregado no es una suma de dinero, ''se parece más bien a la compraventa o al censo.'' 13 Manresa, Código Civil, 56. En el caso de autos Carmen García Reyes no entregó al recurrente ninguna suma de dinero sino que le cedió la hipoteca de que era acreedora y la hipoteca es un derecho real sobre un bien inmueble y está clasificada como un bien inmueble, artículo 263 núm. 10, Código Civil, y como dijimos en el caso de *García et al.* v. *Gar-*

*zot,* 18 D.P.R. 866, 876: ''Cancelar una hipoteca es declararla extinguida, desprenderse de ella, y por consiguiente, enajenarla.''

Morell en sus comentarios a la Legislación Hipotecaria, al comentar el artículo 65 de de la Ley en relación con las causas que pueden dar lugar a que el Registrador deniegue la inscripción de un documento, incluye entre aquellas que se basan en la falta de capacidad absoluta o relativa en el adquirente, los casos comprendidos en el artículo 1348 del Código Civil, supra.

Arguye el recurrente, sin embargo, que siendo la heredera mayor de edad no estaba impedida de vender o ceder el crédito hipotecario al albacea ''toda vez que un albacea no es otra cosa que un mandatario especial para conservar y distribuir entre los herederos los bienes de la herencia'' y por tanto es aplicable la doctrina establecida en *Silva Hno. & Cía.* v. *Registrador,* 28 D.P.R. 179, al efecto de que: ''Aunque el mandatario no puede adquirir los bienes de su mandante, como esta prohibición es de interpretación restrictiva si es el mismo mandante el que se los vende se entiende de hecho revocado el mandato e inaplicable tal prohibición.''

No tiene razón, a nuestro juicio, el recurrente. El albacea aun cuando se le considera un mandatario especial lo es del testador y no de los herederos, 8 Manresa, Código Civil, 686 *et seq.,* especialmente a la página 893, donde después de citar sentencias del Tribunal Supremo de España dice que dicho Tribunal ha sostenido que ''los albaceas son verdaderos mandatarios del testador y no de los herederos . . . ''. La testadora en este caso al nombrar al recurrente como su albacea sabía que él era el deudor del único bien que ella le dejaba como herencia a su hermana. Al mes y ocho días de fallecida la testadora el albacea adquiere para sí dicho crédito mediante el pago a la heredera de una renta vitalicia de $22 mensuales que ya estaba obligado a pagarle como inreses de su deuda. ¿Qué mandato de la testadora estaba

cumpliendo el recurrente? Ninguno. Por el contrario, consideramos que el contrato viola el artículo 1348 del Código Civil, supra, y que no erró el Registrador al negarse a inscribirlo.

*Debe confirmarse la nota recurrida.*