*In re* LUIS ABELLA BLANCO, querellado.

Núm. 68.—*Sometido:* Marzo 6, 1947. *Resuelto:* Abril 22, 1947.

*Cayetano Coll y Cuchí*, abogado del querellado; *Joaquín Correa Suárez, Fiscal Auxiliar del Tribunal Supremo*, abogado de El Pueblo.

El Juez Asociado Señor Snyder emitió la opinión del tribunal.

Luis Abella Blanco, abogado, ocupó el cargo de Registrador de la Propiedad de Caguas durante algunos años hasta que fué destituído por el Gobernador. Véase *Abella* v. *Piñero, Gobernador*, 66 D.P.R. 690. El Procurador General ha radicado esta querella de *disbarment* contra él. El Tribunal oyó prueba de ambas partes y se reservó el fallo en cuanto a ciertas cuestiones de derecho sometidas por Abella.

*Primer Cargo. Abella solicitó $200 y obtuvo de Aida Grillo la suma de $100 para inscribir una cancelación de hipoteca.*

Aida Grillo declaró que Abella había enviado por su padre, Antonio Grillo, para discutir con éste en la casa de Abigaíl Aldrich, una escritura de cancelación de hipoteca que su padre había presentado en el Registro para su inscripción. Toda vez que su padre, fallecido poco después, estaba enfermo y no podía ir, ella fué en su lugar. Abella le dijo que el documento era defectuoso, pero que él podía inscribirlo por $200. Ella se negó, diciendo que si el documento era defectuoso, no debía ser inscrito y que consultaría al abogado de su padre.

Luego, se denegó la inscripción del documento y Abella envió por ella de nuevo. Le dijo que había algo irregular en el documento y que los Registradores tenían autoridad para enviar tales casos a la justicia para investigación. Le leyó al efecto de un libro titulado "La Ley Hipotecaria". La Srta. Grillo contestó que, de acuerdo con el abogado de su padre, el documento no era fraudulento y que si quería enviar el caso a la justicia que así lo hiciera. Él le dijo

que no había necesidad de hacer esto si le entregaba $200. Ella le dijo que no podía hacer eso.

Se radicó un recurso gubernativo contra la nota del Registrador, y este Tribunal la confirmó. Luego, Abella llamó a la Srta. Grillo por teléfono y le dijo que él sabía que el documento iba a ser enviado nuevamente al Registro para inscripción y que él quería hablarle sobre el mismo. Abella la vió en la oficina de su abogado y le dijo que él había averiguado que ella pensaba enviar el documento nuevamente al Registro. Ella le dijo que era cierto, que sería presentado con el testamento de la señora Martina García para probar que su padre no había sido el albacea testamentario de ésta. Abella le dijo que era testaruda y que debía entregarle el dinero con el fin de cerrar el caso, porque él pensaba trasladarse al Registro de Bayamón y él era la única persona que podía inscribir el documento ya que él era el único que había tenido los documentos en sus manos. La Srta. Grillo le dijo a Abella que su abogado le había informado que el documento era inscribible y ella no podía entregarle dicha cantidad. Entonces él le dijo que le debía entregar $100 para la inscripción. Ella le contestó que a pesar de que ella sabía que el documento era inscribible, le iba a entregar a él esa cantidad para lograr la inscripción.

La Srta. Grillo llevó el documento y el testamento al Registro, y unos días más tarde, Abella la llamó por teléfono diciéndole que el documento había sido inscrito y que viniera a recogerlo llevándole el dinero. A tenor con esta conversación, fué al Registro, recogió el documento, y le entregó a Abella el dinero en efectivo. Cuando le hizo entrega del dinero, Abella le dedicó y regaló un ejemplar de su obra, "La República de Puerto Rico".

En el contrainterrogatorio declaró la Srta. Grillo que firmó un libro de recibos que le presentó Pastor Batista, Primer Oficinista del Registro, en la oficina contigua a la del Registrador, después de haberle entregado Abella el documento en su oficina, donde nadie presenció la escena en que

ella le entregó el dinero. Ella le hizo entrega del dinero para acabar con el asunto. Abella le dijo que el documento podía inscribirse pero que él era el único que lo podía inscribir.

Abigaíl Aldrich declaró que era empleada del Registro en Caguas; que Abella almorzaba en su casa; que en dos ocasiones Aida Grillo vino a su casa a verlo a él; que hablaron acerca de un documento, pero que ella no oyó la conversación, y que Abella leyó algo de un libro a la Srta. Grillo.

Luis Morales Contreras, abogado, declaró que, según manifestó Aida Grillo, ella era cliente suya en 1944, que ella se había visto con Abella en la oficina del testigo, y que voluntariamente los había dejado solos para que conversaran.

Pasemos ahora a la prueba ofrecida por Abella para refutar este cargo. Indicamos primeramente que rechazamos los motivos expuestos por el Registrador—la posibilidad de fraude—para negarse a inscribir la escritura de cancelación. *Grillo* v. *Registrador*, 62 D.P.R. 679. No obstante, confirmamos al Registrador por un motivo expuesto no en su nota, sino en su alegato; es decir, que toda vez que Antonio Grillo fué nombrado albacea en el testamento de Martina García Reyes, aquél no podía, en virtud del artículo 1348 del Código Civil, adquirir por compra el crédito hipotecario dejado por la finada a su hermana en el testamento.

Abella admitió en su declaración que era errónea la manifestación contenida en su alegato al efecto de que Antonio Grillo fué nombrado albacea en el testamento de Martina García. Es dudosa su explicación en cuanto a cómo fué que él nos dió esa información errónea. Declaró que él pasaba a maquinilla su alegato en ese caso mientras Pastor Batista le leía de los libros del registro, y que Batista le dijo: "Mire licenciado, aquí aparece que este señor Grillo es albacea testamentario y por consecuencia no puede adquirir ese crédito hipotecario." Entonces incluyó esa contención en su alegato. En el Registro no había tal constancia. La cuarta inscripción de la propiedad decía solamente

que en su testamento Martina García había nombrado a Grillo contador-partidor.

Difícil es creer que un Registrador acepte el mero *ipse dixit* de un empleado sobre un hecho fundamental que el Registrador nunca levantó en su nota original. Es significativo que Batista, testigo de Abella, declarara en su contrainterrogatorio que no se acordaba si le había dicho esto a Abella cuando le leía a éste los asientos del Registro. Es más, en la moción de reconsideración del recurso gubernativo, que denegamos porque fué radicada tardíamente, el abogado de la recurrente manifestó que Grillo nunca había sido albacea. Abella fué notificado con esta moción y radicó una oposición a la misma, por el fundamento de que un albacea y un contador-partidor eran la misma cosa a los efectos del artículo 1348.

Declaró que el asunto no volvió a relucir hasta diez meses después, cuando el abogado de la Srta. Grillo le habló a él sobre el mismo y él sugirió que volviera ella a presentar el documento. Cuando se le presentó, reconoció su error y lo corrigió inscribiendo el documento sin defecto alguno. Cuando la Srta. Grillo trajo el documento para ser inscrito, ella le dijo que quería gratificar con parte a los empleados que iban a trabajar en el mismo, y que el resto sería para él. Él le dijo que allí no se permitían gratificaciones y que él lo que hacía era cumplir con su deber, porque ahora el documento se podía inscribir ya que ella había traído el testamento del cual surgía que Grillo no era el albacea.

Ella le pidió un ejemplar de su obra "La República de Puerto Rico" y él le prometió dárselo más tarde, lo que hizo cuando ella fué a la casa de Abigaíl unos días después para hablarle a él del asunto. Él no le hizo entrega a ella del documento inscrito. Esto se hizo por un subalterno, como era la costumbre. Que con motivo de esta transacción, la Srta. Grillo se había vuelto enemiga suya y le atribuía la muerte de su padre a la contrariedad surgida debido a este asunto.

Batista declaró a favor de Abella que había recibido el documento de la Srta. Grillo para ser inscrito, que el testigo se lo entregó a ella después de incribirse el mismo, y que el Registrador no estaba en el Registro en dicha fecha. En el contrainterrogatorio no pudo explicar por qué el documento de la Srta. Grillo fué inscrito prontamente, fuera de turno, a pesar del hecho de que un número de documentos estaban pendientes de inscripción con anterioridad a aquél.

No tenemos que determinar si Abella realmente creyó que Grillo era el albacea cuando así lo hizo constar en su alegato ante este Tribunal. Sea ello como fuere, la declaración de la Srta. Grillo y todas las circunstancias concurrentes, nos convencen de que su declaración es cierta y de que Abella le pidió $200 para inscribirle el documento en la primera ocasión, y que asimismo le pidió y obtuvo de ella $100 para registrarle el documento, una vez que le confirmamos la nota denegatoria por haber expuesto erróneamente los hechos que constaban del Registro. En su consecuencia resolvemos que el primer cargo está sostenido por la prueba.

*Segundo Cargo. Abella solicitó del Lic. E. Martínez Rivera la suma de $500 para inscribirle sin defecto alguno una escritura de cesión de crédito hipotecario.*

Martínez, un abogado con bufete en San Juan, declaró que llevó a Caguas un documento para inscribrlo y que lo dejó con Abella. Algunos días después, Abella lo llamó por teléfono y le invitó para que fuera a su casa en Santurce. Martínez fué y Abella le dijo que la inscripción del documento conllevaba bastante estudio y que si Martínez tenía prisa, sus empleados tendrían que trabajar horas extras y fines de semana, y había que pagarle compensación extra a los empleados.

Martínez convino en hablar con su cliente en cuanto a la compensación extra a los empleados del Registro por trabajar horas extras. El cliente le autorizó a gastar $50 en esto. Cuando Martínez le dijo esto a Abella, éste rechazó

la proposición. Dijo que había estudiado el documento y había llegado a la conclusión de que no lo podía inscribir. Sacó de su bolsillo una minuta de la propuesta nota denegatoria de la inscripción y se la leyó a Martínez. Martínez le dijo que estaba equivocado y que debería volver a estudiar la cuestión. Abella se negó, a lo que Martínez le dijo que dictara la nota y que él solicitaría la revisión ante esta Corte. Abella le dijo a Martínez que no debería correr ese riesgo en tan importante documento; que había tenido antes casos de esta naturaleza; que era fácil de arreglar; y que si le traía $500, el documento podría ser inscrito sin defecto. Martínez contestó que era el deber del Registrador denegar el documento si éste era defectuoso, y se fué.

Luego, Abella lo volvió a llamar por teléfono y le dijo que aún no había denegado la inscripción porque le quería dar otra oportunidad. Nuevamente Martínez se negó a considerar esta proposición. Se denegó la inscripción, y este Tribunal revocó la nota del Registrador y ordenó la inscripción del documento. *Valiente* v. *Registrador*, 63 D.P.R. 149.

Luis Blanco Lugo, abogado que trabaja en el bufete de Martínez, fué al Registro de Caguas sobre otro asunto. Se presentó al Registrador y le habló en un esfuerzo para convencerle de que estaba equivocado en otro caso. Durante el curso de la conversación se discutió el caso de *Valiente,* que estaba pendiente ante este Tribunal y en el cual Blanco Lugo había trabajado. Éste le explicó a Abella por qué él creía que también estaba equivocado en dicho caso el Registrador. Entonces Abella le dijo que ese caso se debía a la temeridad de Martínez por no haberle entregado la suma de $500.

La declaración de Abella, en contestación al segundo cargo, fué que le envió a Martínez una copia de la nota que le iba a poner al documento. Dos o tres días después, Martínez lo vino a ver a su casa en Santurce. Martínez le dijo que estaba equivocado y que Martínez ganaría el caso ante este Tribunal. Abella le dijo que el Tribunal Supremo de-

cidiría el caso. Martínez le dijo que él quería ahorrar tiempo y evitar controversias judiciales, y que si Abella le inscribía el documento sin defecto alguno, Martínez hablaría con su cliente para tratar de obtener $500 para Abella. Abella se ofendió y pensó en castigar a Martínez. Sugirió esperar. Martínez contestó que regresaría dentro de dos o tres días.

Al día siguiente Abella envió inmediatamente a Martínez el documento con la nota denegatoria. Dos días después, Martínez vino a verlo de nuevo. Le ofreció un sobre con $250, diciéndole que le daría el resto después de inscrito el documento y le daría $50 de su bolsillo para tramitar el asunto lo antes posible. Abella le dijo que estaba perdiendo su tiempo y que se guardara el dinero porque ya había denegado la inscripción del documento.

Abella declaró además que tuvo una conversación con Blanco en la que éste trató de convencerle de su supuesto error en el caso de *Valiente*. No le habló a Blanco en relación con los $500 que Martínez debió entregarle.

La esposa de Abella declaró que había oído a Martínez ofrecerle a su esposo $500 si le resolvía la situación con respecto a la inscripción de un documento.

Después de estudiar todas las circunstancias, llegamos a la conclusión que Martínez y Blanco y no Abella dijeron la verdad de lo ocurrido en relación con el segundo cargo. Por tanto resolvemos que este cargo también ha sido probado por la evidencia.

*Tercer Cargo. Abella solicitó y obtuvo $45 de Santiago Soto para que inscribiera cierto documento sin presentar un recibo de las contribuciones sobre herencia que se alega se adeudaban en relación con la transacción.*

Soto declaró que Genoveva Rivera Rodríguez le donó a su menor hijo, Carlos Soto Rodríguez, mediante una escritura, la nuda propiedad en cierta finca, reservándose el usufructo para sí. A su muerte, Soto presentó el certificado de

defunción al Registro con el fin de obtener una nota marginal consolidando a favor de Carlos el pleno dominio. Batista le dijo que esto no se podía hacer sin el pago de contribuciones sobre herencia. Véanse secciones 1 y 12, Ley núm. 99, Leyes de Puerto Rico, 1925 (pág. 791).

Soto le informó a su abogado, Andrés Mena Latorre, lo que había sucedido. Mena le dijo que hablaría con Abella. Dos días después, Mena lo llamó por teléfono y le dijo que viniera a su oficina. Abella estaba allí, y convinieron en que Abella obtendría $45 para inscribir el documento. Fué a su casa y buscó el dinero, regresando y entregándoselo a Abella.

Mena declaró lo mismo que Soto en relación con el **pago** de $45 a Abella.

Abella declaró en su defensa, sobre el tercer cargo, que Mena había sido su enemigo desde el asunto de Grillo, porque había perdido a Grillo como cliente, como resultado de la denegatoria hecha por él de la inscripción del documento. Batista le dijo que había informado a Soto que tenía que pagar las contribuciones de herencia para poder inscribir el documento. Abella le contestó a Batista que eso no era así, y que el documento podía inscribirse sin pagarse tales contribuciones.

Mena lo llamó por teléfono un día invitándole que viniera a su oficina. Mientras estaba allí, Mena llamó a Soto por teléfono para que trajera el dinero, diciéndole que eran $50. Soto aparentemente se opuso, porque dijo entonces que estaba bien con $45. Abella estaba por irse, pero Mena insistió en que se quedara. Soto vino y puso el dinero sobre el escritorio de Mena y Abella se fué. Luego, después de formularse estos cargos, el día en que Abella entregaba el Registro al Fiscal por haber sido suspendido de empleo y sueldo, Soto fué allí y le dijo a Abella que sentía que le hubieran formulado cargos ya que Soto había entregado el dinero a Mena en pago de los honorarios de este último.

Una vez más damos crédito a los testigos del Procurador General y no a Abella. En su consecuencia resolvemos que el tercer cargo ha sido probado.

Resta considerar ciertas cuestiones de derecho suscitadas por Abella. La sección 9 de la Ley de 11 de marzo de 1909 dispone que un abogado puede ser suspendido o desaforado si "[a] fuere culpable de engaño, conducta inmoral, delito grave o delito menos grave, en conexión con el ejercicio de su profesión o . . . [b] fuere culpable de cualquier de lito que implicare depravación moral . . .". Abella alega que (b) sólo puede establecerse demostrando convicción ante una corte de jurisdicción competente. Y en cuanto a (a), alega que el desempeño de las funciones de un Registrador no constituye ejercicio de la profesión de abogado, *Pereyó v. López et al.,* 22 D.P.R. 780, sección 9 de la Ley de marzo 10, 1904; y por tanto su conducta impropia como Registrador no puede castigarse de acuerdo con (a) de la Ley de 1909, porque tal conducta impropia para caer dentro de las disposiciones de (a) debe ocurrir en relación con el ejercicio de la profesión de abogado.

■■ No podemos convenir con estas contenciones. En primer lugar, tenemos poder inherente para disciplinar a los miembros del foro. La Ley de 1909 sólo es directiva, y no mandatoria para este Tribunal. Véanse *In re Tormes,* 30 D.P.R. 267; *In re Bosch,* 65 D.P.R. 248, 251; *Ex parte Jiménez,* 55 D.P.R. 54; *Guerrero* v. *Tribunal de Apelación de Contribuciones,* 60 D.P.R. 241. Bajo nuestro poder inherente, es nuestro deber desaforar a Abella si por su conducta ha demostrado, no necesariamente en el ejercicio de la profesión de abogado, que no es digno de ser un miembro del foro. *In re Tormes,* supra; *In re Chernoff,* 26 A.2d 335 (Pa., 1942); *In re Welansky,* 65 N.E.2d 202, 204-5 (Mass., 1946); *In re Alschuler,* 58 N.E.2d 563, 567-8 (Ill., 1944); *Brant* v. *State,* 34 S.E.2d 735 (Ga., 1945); *Ex parte Montgomery,* 12 So.2d 314 (Ala., 1943).

■ Además, aun cuando ésta no fuera la regla, solamente un abogado puede ser nombrado Registrador. Sección 1 de la Ley de 10 de marzo de 1904, según fué enmendada por el artículo 1 de la Ley de 16 de marzo de 1909. Y en el desempeño de sus deberes un Registrador considera problemas legales y actúa con capacidad cuasi-judicial. *The R.F.C. Mortgage Co.* v. *Registrador,* 60 D.P.R. 235, 239. Su conducta impropia en el desempeño de dichos deberes es, por tanto, claramente pertinente para determinar si es digno de permanecer siendo miembro del foro. Resolver lo contrario equivaldría a decir en efecto que un juez no puede ser desaforado por aceptar sobornos. Véase *Ex parte Grace,* 13 So.2d 178 (Ala., 1943).

■■ Abella alega que la Srta. Grillo y Soto eran cómplices, y que por tanto sus declaraciones debían ser corroboradas. En primer lugar, el récord demuestra tal corroboración. Además, el que da y el que recibe un soborno no son cómplices bajo la regla que exige que la declaración de un cómplice deba ser corroborada. *Forastieri* v. *Calzada,* 53 D.P.R. 251. Finalmente, éste no es un caso criminal sino un procedimiento *sui generis* de *disbarment,* en el que no es de aplicación dicha regla. Véanse *López de Tord & Zayas Pizarro* v. *Molina,* 38 D.P.R. 823, 836–38; *In re Ries,* 37 A.2d 417, 419 (N.J., 1944).

■■ Abella también alega que el haber él aceptado dinero para inscribir el documento de Grillo no constituye el delito de soborno en violación del artículo 83 del Código Penal, por el fundamento de que este delito surgiría solamente si Abella hubiera actuado contrario a derecho y aquí el documento inscrito era válido e inscribible. No nos detenemos a examinar ésta como una posible defensa en un caso criminal. *Cf. Ex parte Montgomery,* supra, pág. 317. Sólo indicamos que (1) el artículo 85 del Código Penal establece como *misdemeanor* el que un funcionario ejecutivo o administrativo pidiere o admitiere cualquier gratificación por ejecutar algún acto oficial, *cf.* Ley de 10 de marzo de 1904, que se en-

cuentra a la pág. 363 del Código Penal, ed. de 1937; y que (2) aun sin referirse al Código Penal, tal conducta de un miembro del foro justifica medidas disciplinarias contra él en virtud de nuestro poder inherente.

Considerando la naturaleza de los cargos que han sido establecidos por la prueba, *se dictará resolución separando a Abella del ejercicio de la profesión de abogado.*

El Juez Asociado Sr. Marrero no intervino.