EVA MARTA PIAZZA CINTRÓN y CÁNDIDA CINTRÓN LUCA, demandantes-recurridas, *v.* JOSÉ AMÉRICO PIAZZA OLAYA y ANA CARMEN PIAZZA MORESCHI, demandados-recurrentes.

*Número:* 12152. *Resuelto:* 8 de septiembre de 1961.

*Luciano Colón,* abogado de las demandantes-recurridas; *Leopoldo Tormes García,* abogado de los demandados-recurrentes.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

Al óbito de don Alejandro Piazza Massini ocurrido en 20 de agosto, de 1949, le sucedieron como herederos abintestato sus seis hijos José Américo, Alejandro Antonio, Ana Beatriz, Nuncia Josefa, Esther Elena y Asunción María, todos de apellidos Piazza Olaya. Entre los bienes relictos al fallecimiento de dicho causante estaba una estancia de aproximadamente doscientas cuerdas, denominada Concepción, sita en el barrio Aguas Blancas de Yauco. Esta finca había sido administrada durante más de veinticinco años por el demandado José Américo Piazza Olaya, quien continuó en tales gestiones después del fallecimiento de su padre "por un acuerdo de familia". Se dedicaba al cultivo de café y frutos menores, y periódicamente el heredero Alejandro Antonio recibió algunas

cantidades de dinero a cuenta de su participación en los frutos.

Alejandro Antonio Piazza Olaya falleció en 5 de febrero de 1953 bajo testamento abierto en el cual, después de haber legado el tercio de libre disposición a su sobrina Ana Carmen Piazza Moreschi, hija del demandado, instituyó como universal heredera a su hija única Eva Marta Piazza Cintrón, sin perjuicio de la cuota vidual usufructuaria correspondiente a su cónyuge doña Cándida Cintrón. El condominio indiviso de una sexta parte correspondiente al testador en la estancia Concepción se inscribió en el Registro de la Propiedad en proporción de dos terceras partes a favor de Eva Marta, y una tercera parte a favor de la legataria. *Piazza* v. *Registrador*, 78 D.P.R. 301 (1955).

El demandado adquirió en 15 de abril de 1952 los condominios en la finca mencionada pertenecientes a sus hermanas Nuncia Josefa, Esther Elena y Asunción María; y en 8 de mayo de 1953, el de su otra hermana Ana Beatríz. La compraventa se efectuó a razón de $2,166.66 por cada condominio, de cuya suma se satisfizo la cantidad de $1,000 en el acto del otorgamiento, y el balance de $1,166.66 se destinó a pagar la parte proporcional de un crédito que por la suma total de $7,000 habían reconocido adeudar los miembros de la Sucesión Piazza-Olaya a su hermano José Américo, por las gestiones de administración de las fincas que éste había realizado.

En 5 de mayo de 1953 los demandantes vendieron al demandado el condominio de dos tercios de una sexta parte y el derecho de usufructo que tenían inscritos sobre la finca Concepción, y para ello, comparecieron personalmente al otorgamiento de la correspondiente escritura pública. Las condiciones de la venta fueron similares a las acordadas con las hermanas del comprador, o sea, se recibió determinada cantidad en efectivo y se le reconoció en la liquidación del precio la parte proporcional que correspondía pagar al extinto Alejandro Antonio del crédito a favor de José Américo por sus gestiones de administración. Y, finalmente, en 3 de junio de

1953, Ana Carmen Piazza le vendió al demandado el condominio restante de un tercio de una sexta parte, consolidando así éste su título de dominio sobre toda la finca.([1])

En el testamento otorgado por Alejandro Antonio Piazza se designó al demandado como albacea "con las facultades en ley correspondientes, para que proceda, llegado el momento, a inventariar sus bienes para su liquidación, división y adjudicación, haciendo y gestionando lo necesario hasta dejar terminada su testamentaría a cuyo fin se fija el plazo de un año." El albacea no aceptó formalmente el cargo ni prestó juramento para su ejercicio. No se le expidieron cartas de albaceazgo por tribunal competente. Tampoco lo renunció en la forma dispuesta por ley.

En mayo de 1955 Eva Marta Piazza Cintrón y su madre doña Cándida Cintrón iniciaron una acción contra José Américo Piazza Olaya y la legataria Ana Carmen Piazza Moreschi interesando (a) se declarara la nulidad de los dos contratos de compraventa mediante los cuales dicho demandado había adquirido de las herederas y la legataria sus respectivos derechos en el condominio de una sexta parte en la finca Concepción pertenecía a Alejandro Antonio Piazza; y, (b) se le ordenara a pagarles su participación en los frutos producidos por la dicha finca.

El tribunal de instancia declaró sin lugar la demanda, pero luego de considerar una moción de reconsideración presentada por la parte demandante, procedió a dictar una nueva sentencia favorable a ésta. Después de formular determinaciones sobre los hechos reseñados anteriormente,([2]) concluyó

---

([1]) La demandante Eva Marta Piazza recibió $900 en efectivo por su condominio de *dos tercios* de una sexta parte. Resulta pues, que la venta fue efectuada bajo condiciones más ventajosas que las de sus tías, quienes sólo recibieron mil dólares cada una por la *totalidad* de su condominio de una sexta parte.

([2]) Las determinaciones de hechos del tribunal de instancia leen:

"1. Que el co-demandado José Américo Piazza Olaya fue designado albacea testamentario universal por su hermano Alejandro Piazza Olaya en el testamento otorgado por éste el 13 de octubre de 1949 ante el notario de Yauco Adrián Alfonso Muñiz, y como tal estuvo en posesión y custodia

que (a) la venta de las demandantes al demandado era nula por infringir el artículo 1348 del Código Civil; (b) la venta hecha por la legataria era nula porque tratándose de un legado genérico, ella no podía disponer de una parte determinada de los bienes del caudal; y, (c) no procedía la reclamación de frutos por no haberse probado satisfactoriamente su

---

de todos los bienes dejados por el testador, quien falleció el día 15 de febrero de 1952.

"2. Que el finado Alejandro Piazza Olaya en su referido testamento legó el tercio de libre disposición a su sobrina Ana Carmen Piazza Moreschi e instituyó por sus únicas y universales herederas de sus bienes a su hija y esposa, respectivamente, Eva Marta Piazza Cintrón y Cándida Cintrón Luca, demandantes en este caso.

"3. Que el día 5 de mayo de 1953 y por escritura pública ante el notario Luis López de Victoria, José Américo Piazza Olaya le compró a los demandantes, herederas de Alejandro Piazza Olaya, dos terceras partes de una sexta parte que correspondía al finado en la finca de doscientas cuerdas a que se refiere esta demanda, por el precio de mil seiscientos setenta y siete dólares con sesenta y seis centavos ($1,677.66), de los cuales pagó a las herederas mil dólares ($1,000) en moneda de curso legal y retuvo el resto para el pago de una acreencia que alegó tener contra el causante de las demandantes.

"4. Que en 8 de marzo de 1954 la legataria Ana Carmen Piazza Moreschi solicitó y obtuvo del registrador de la propiedad de San Germán, con vista del acta de defunción del causante Alejandro Piazza Olaya y de la escritura de testamento y otros documentos, que inscribiera a su favor una tercera parte determinada de la sexta parte que correspondía al causante en la citada finca de doscientas cuerdas.

"5. Que por escritura de fecha 3 de junio de 1953 ante el notario don Celestino Vargas Hernández, la legataria Ana Carmen Piazza Moreschi vendió a su padre José Américo Piazza Olaya una tercera parte determinada de la sexta parte que correspondía al finado en la finca de doscientas cuerdas ya mencionada, escritura que también se inscribió en el Registro de la Propiedad de San Germán.

"6. Que a la fecha de la inscripción y venta de dicha tercera parte determinada por la legataria Ana Carmen Piazza Moreschi no se había practicado liquidación ni división de clase alguna de los bienes relictos al óbito del causante Alejandro Piazza Olaya, ni se había solicitado por la legataria el pago de su legado de los herederos del causante.

"7. Que el demandado José Américo Piazza Olaya y otra persona que responde al nombre de Felipe Piazza han entregado periódicamente cantidades de dinero a la demandante Eva Marta Piazza Cintrón de los productos o frutos producidos por la finca a que se refiere la demanda y las demandantes no han probado los frutos que dicha finca realmente hubiera producido ni los gastos en que se hubiere incurrido para atender a los cultivos de esa finca."

importe—el valor de las cosechas y gastos para su produc-
ción—pero indicó que ello era "sin perjuicio de que éstos pue-
dan ser reclamados por la parte interesada en una acción in-
dependiente". Contra esta sentencia se interpuso recurso de
apelación.

I

Dispone el artículo 1348 del Código Civil (31 L.P.R.A.
sec. 3773), equivalente al 1459 del Código Civil Español, que:

"No podrán adquirir por compra, aunque sea en subasta pú-
blica o judicial, por sí ni por persona alguna intermedia:

"1. El tutor, los bienes de la persona o personas que estén
bajo su tutela.

"2. Los mandatarios, los bienes de cuya administración o ena-
jenación estuviesen encargados.

"3. *Los albaceas, los bienes confiados a su cargo.*

"4. Los empleados públicos, los bienes del Estado Libre Aso-
ciado de Puerto Rico, de los municipios, de los pueblos y de los
establecimientos también públicos, de cuya administración estu-
viesen encargados.

"Esta disposición regirá para los jueces y peritos que de cual-
quier modo intervinieren en la venta.

"5. Los jueces, individuos del ministerio fiscal, secretarios de
tribunales y juzgados y oficiales de justicia, los bienes y derechos
que estuviesen en litigio ante el tribunal, en cuya jurisdicción
o territorio ejercieran sus respectivas funciones, extendiéndose
esta prohibición al acto de adquirir por cesión.

"Se exceptuará de esta regla el caso en que se trate de accio-
nes hereditarias entre coherederos, o de cesión en pago de cré-
ditos, o de garantía de los bienes que posean.

"La prohibición contenida en este número 5 comprenderá a
los abogados respecto a los bienes y derechos que fueren objeto
de un litigio en que intervengan por su profesión y oficio." (Bas-
tardillas nuestras.)

Este precepto relativo al contrato de compraventa figura
en el capítulo sobre la capacidad para comprar o vender.
Puig Brutau([3]) lo discute entre las prohibiciones impues-

---

([3]) Puig Brutau, *Fundamentos de Derecho Civil*, vol. II, 2º pág. 138.

tas a las personas encargadas de vender bienes a nombre de otros, e indica que en estos casos no puede realizarse el contrato de compraventa en perjuicio de ciertos intereses que el ordenamiento jurídico "trata especialmente de proteger". En otras palabras, la disposición que consideramos responde al propósito de evitar perjuicios a los pupilos, en el caso del tutor; los mandantes, en el de apoderados; los herederos, en el del albacea, y así respectivamente. Borrel y Soler [4] indica que la prohibición se justifica "por razones de moralidad en evitación de fraudes y en algunos casos para mantener el prestigio de algunas personas." El Profesor Velázquez, [5] de la Facultad de Derecho de la Universidad de Puerto Rico, la califica como una incapacidad de goce, y no de ejercicio, por referirse a ciertos grupos de personas que se ven privadas del derecho mismo de comprar o vender y añade que "estriba esta prohibición en la consideración moral de que la persona encargada de vender una cosa a nombre de otra vería planteado un conflicto entre su interés y su deber si se le permitiera comprarla" (*op. cit.*, pág.9), [6] *Zayas* v. *Orraca*, 80 D.P.R. 339, 346 (1958). Scaevola, [7] al comentar el artículo 1719 del Código Civil Español, aduce que la doctrina actual se inclina a que estas prohibiciones legales están fundadas en la "incompatibilidad de intereses y consiguiente peligro *de una sola voluntad* aproveche en beneficio propio la coyuntura que la posibilidad de la autocontratación le ofrece." (Bastardillas

---

[4] Antonio M. Borrel y Soler, *El Contrato de Compraventa Según el Código Civil Español*, (Ed. Bosch, Barcelona, 1952), págs. 21–22.

[5] Guaroa Velázquez, *Obligaciones y Contratos según la Legislación Puertorriqueña—Contratos Especiales*, ed. 1952, pág. 7.

[6] En parecidos términos se expresa Castán, acudiendo a Planiol, cuando dice:

"Se funda este grupo de prohibiciones, más que en los obstáculos técnicos del llamado contrato consigo mismo, en la consideración de orden moral, indicada por Planiol, de que las personas encargadas de vender una cosa a nombre de otro vería planteado un conflicto entre su interés y su deber si se le permitiera comprarla . . ." (Derecho Civil Español, Común y Foral, ed. 1956, tomo 4, pág. 67).

[7] Scaevola, Código Civil, (ed. 1951), tomo XXVI, vol. II, pág. 130.

nuestras.) Santamaría ([8]) citando el autor italiano Francesco Messinero, indica que sería más correcto llamarlas incompatibilidades en vez de prohibiciones. Ruggero Luzzato, Profesor de Derecho Civil en la Universidad de Génova, expone en su obra *La Compraventa Según El Nuevo Código Civil Italiano* (traducción de Francisco Bonet Ramós, ed. Reus, 1953), dice, comentando un precepto similar:

"El concepto general es éste: el legislador ha considerado inoportuno que las personas a que corresponda la tutela de otras personas o de entes puedan comprar los bienes de sus protegidos, porque quizá fueran inducidas a perjudicar los intereses que, en cambio, deben proteger, y ordinariamente podrían dar lugar a sospechas; además, se considera peligroso que los funcionarios, por cuyo ministerio se venden ciertos bienes, puedan ser sus adquirentes, porque por ello podrían dejarse inducir a un mal uso de sus funciones, que exigen imparcialidad y rectitud.

"No obstante una cierta semejanza de estos casos con los de incapacidad de obrar, las diferencias son profundas: 1) Las normas sobre la incapacidad están fundadas, en general, en una *inaptitud natural* del sujeto; en cambio, aquellas de que ahora hablamos están fundadas en razones de *conveniencia social*. 2) Las normas sobre la incapacidad abrazan *toda la actividad* del sujeto o alguna esfera de ésta, mientras aquí están prohibidos los contratos en *casos particulares*. Puede observarse sobre todo que de la incapacidad nace la imposibilidad de que el sujeto manifieste eficazmente la propia voluntad, o bien la necesidad de que su manifestación de voluntad sea completada por órganos de protección (representación del padre, del tutor, asistencia del curador, etc.), pero el contrato se puede constituir en interés y en nombre del incapaz; en cambio, en los casos ahora descritos, se tiene otra especie de incapacidad, una incapacidad en sentido más profundo, esto es, en el sentido de la *incapacidad jurídica*, no en el de la *incapacidad de obrar*, porque las normas antes recordadas excluyen que ciertos contratos de compraventa puedan celebrarse por ciertos sujetos, los cuales por eso no los podrán concluir, *ni directamente, ni de cualquier otro modo*." (Bastardillas nuestras.)

---

([8]) Santamaría, *Comentarios al Código Civil*, ed. 1958, vol. II, pág. 492.

 Precisamente debido al carácter prohibitorio del precepto, se le ha dado una interpretación restrictiva, o sea, que no se ha extendido en cuanto a su aplicación más que aquellos casos que caen claramente bajo su letra, *Zayas* v. *Orraca*, 80 D.P.R. 339, 345 (1958). De ahí en el caso de los albaceas es indispensable que los bienes le hayan sido confiados por razón del albaceazgo y que la prohibición sea de carácter temporal, que sólo existe si en el momento preciso de la venta le estén confiados los bienes objeto de la compraventa. Y en el caso de los albaceas a título particular, el impedimento no se extiende a aquellos bienes, que aunque formen parte del caudal, no están bajo su custodia inmediata, prevaleciendo únicamente en cuanto a los que se encuentran a él expresamente confiados. [9]

 La prohibición en cuanto al mandatorio de adquirir los bienes de cuya administración o enajenación estuvieren encargados ha sido objeto de interpretación más frecuente en cuanto se refiere a su alcance y limitaciones. Véanse, *Latallalde* v. *Registrador*, 66 D.P.R. 685 (1946) ; *Fernández* v. *Laloma*, 56 D.P.R. 367 (1940) ; *Falagán* v. *Registrador*, 40 D.P.R. 424 (1930) ; *Luce & Co.* v. *Registrador*, 33 D.P.R. 489 (1925), desestimado en 20 F.2d 115 (1927) ; *Sobrino, Fernández & Cía.* v. *Registrador*, 27 D.P.R. 459 (1919) ; *Rosenstadt & Walles, Inc.* v. *Registrador*, 23 D.P.R. 289 (1915) ; *Turner* v. *Registrador*, 22 D.P.R. 573 (1915) ; *Giménez* v. *Registrador*, 21 D.P.R. 329 (1914). Pero obedeciendo ambos a los mismos motivos, que ya expusimos previamente, podemos recurrir a las interpretaciones en el caso de la existencia de la relación fiduciaria de mandante y mandatario para fijar a su vez el ámbito de verdadera aplicación en el supuesto de los albaceas. [10] Cobra entonces verdadera significación la sentencia de 17 de junio de 1920 (Jurisprudencia Civil, tomo 150,

---

[9] Valverde, *Tratado de Derecho Civil Español*, ed. 1926, vol. 5, pág. 376.

[10] Véase, Manresa, *Código Civil Español*, ed. 1950, vol. X, págs. 129-136

pág. 623), al efecto de que la disposición legal sólo prohibe a los mandatarios "atendida su letra, la adquisición por sí o por persona intermedia de los bienes de cuya administración o enajenación estén encargados al realizarse la compra, circunstancias que no se dan en el contrato en que el mandatario *no interviene a un mismo tiempo con la doble personalidad de vendedor y comprador...*" (Bastardillas nuestras.) Véase, Sentencia del Tribunal Supremo de España de 12 de noviembre de 1907 (109 Jurisprudencia Civil, 110, 122). En otras palabras, que cuando no existe *una sola conjugación* de voluntad de las manifestaciones requeridas en un contrato bilateral como el de compraventa, no es de aplicación la prohibición aludida. Esto es particularmente cierto cuando el propio mandante, o heredero en nuestro caso, participa directa y personalmente en el otorgamiento y formalización del contrato. Así se pronuncia la sentencia de 3 de junio de 1949 (III Jurisprudencia Civil, pág. 27, 46) en las siguientes palabras:

"Considerando que en el cuarto motivo formulado al amparo del número primero del artículo 1.692 de la Ley Procesal se impugna la validez del contrato de compraventa en atención a la falta de capacidad del comprador, quien al hallarse provisto de poder para administrar las cosas vendidas incurre en la prohibición que establece el número 2º del artículo 1.459 del Código Civil, pero esta argumentación que se presenta como irrebatible en apariencia pierde en el presente caso todo su vigor si se tiene en cuenta: Primero, que en el mencionado contrato el comprador no aparece obrando en virtud de su apoderamiento, sino en su propio nombre, y es el dueño mismo el que directamente formaliza el contrato, por lo que la personalidad del mandatario quedó en dicho acto anulado por la intervención del mandante, y en tales circunstancias tiene establecida la jurisprudencia que, no obstante los términos del precepto, no es de aplicación la prohibición que contiene el número 2º del citado artículo 1.459 del Código (sentencia de 17 de junio de 1920; . . ."

Idéntica interpretación dimos a las disposiciones del número segundo del artículo 1362 del Código Civil de 1902, correspondiente al 1348 del actual, en *Mancheño* v. *Le Brun*

*et al.*, 14 D.P.R. 474 (1908), en donde indicamos a la página 482, que cuando el mismo mandante vende los bienes a su mandatario ello tiene el efecto de hacer cesar el mandato y desaparece así el motivo legal de la incapacidad que consiste en que el mandatario forma con el mandante una sola persona jurídica. Posteriormente, citamos con aprobación esta interpretación en *Silva Hno. y Cía* v. *Registrador*, 28 D.P.R. 177 (1920), y repetimos que esta prohibición de la ley ha sido siempre interpretada restrictivamente "por oponerse a la libertad de contratación" (pág. 181). En *Zayas* v. *Orraca*, 80 D.P.R. 339, 346 (1958) dijimos que para que la incapacidad relativa pudiera aplicarse era necesario que en el acto de la compraventa el mandatario actuara a un tiempo con la doble personalidad de vendedor en representación ajena y comprador en su propio y personal derecho. Sin embargo, en *Grillo* v. *Registrador*, 62 D.P.R. 679 (1943) aplicamos el artículo citado para resolver que un contrato de cancelación de hipoteca otorgado por una heredera a favor de un albacea infringía sus disposiciones. Nos apartamos del criterio de interpretación restrictiva e intervenimos en las relaciones contractuales de los otorgantes. Ahora bien hemos examinado detenidamente el expediente de este recurso y estamos satisfechos de que la cuestión no se planteó en la forma que la hemos discutido en esta opinión, y que por tanto, la resolución aludida no milita en contra del criterio que ahora expresamos. No obstante, para mayor certidumbre en la jurisprudencia, cualquier manifestación en contrario a lo aquí resuelto que pueda expresarse en el caso de *Grillo*, queda revocada.

*Pabón* v. *Registrador*, 75 D.P.R. 463 (1953), es distinguible de la situación que consideramos, pues si bien se trataba de la cancelación de una hipoteca a cuyo otorgamiento concurrió la acreedora—una menor emancipada—, la deudora hipotecaria—la madre de la menor—tenía que comparecer no sólo como tal deudora, sino como madre con patria potestad a los fines de cubrir la presunta falta de capacidad de la hija, según provisto en el artículo 237 del Código Civil. Dijimos que "si la

persona llamada a suplir esta falta de capacidad resulta ser la misma persona a favor de quien ha de realizarse la enajenación, es indudable que el propósito fundamental del legislador queda defraudado". Cf. *Alvarez* v. *Secretario de Hacienda*, 80 D.P.R. 16, 56 y ss (opinión disidente); *Belaval* v. *Tribunal de Expropiaciones*, 71 D.P.R. 265 (1950). Pero en este caso, la heredera vendedora era mayor de edad, en pleno uso de sus derechos civiles, profesora de instrucción pública, y nada sugiere—como lo intima el tribunal de instancia—que el albacea comprador tomara ventajas indebidas de su posición. Por el contrario, la transacción efectuada respondió al mismo patrón que las compras anteriores a las otras condueñas. Véase, *Seoane* v. *El Registrador*, 23 D.P.R. 810 (1916).

En el estado de Luisiana se ha impuesto una solución similar al interpretar disposiciones relativas a la incapacidad del albacea para adquirir bienes de la herencia. Véanse, los artículos 1146 y 1790 del Código Civil (West's Louisiana Civil Code, ed. 1952, vols. 4 y 6, págs. 676 y 426), sustituidos en 1960 por los artículos 3194 y 3195 del Código de Procedimiento Civil (West's Louisiana Code of Civil Procedure, ed. 1961, vol. 7, págs. 232 y 236); *Michand* v. *Girod et al.*, 4 How. 554 (1846); *Crow* v. *Griffin*, 6 La. Ann. 316 (1851); *Ross* v. *Ross*, 3 La. Ann. 533 (1848); *Powers of a Succession Representative in Louisiana*, 27 Tul. L. Rev. 87, 104–105 (1952).

 Existe, a nuestro juicio, otro motivo adicional para —dándole virtualidad a la interpretación restrictiva enunciada—rechazar la posición del tribunal de instancia sobre la infracción del artículo 1348 del Código Civil.([10a]) En primer lugar, como expresamos anteriormente, los bienes han de estar confiados al albacea, por razón de su cargo. Cf. *Bengoa* v. *Registrador*, 14 D.P.R. 107 (1908). En las circunstancias

---

([10a]) El demandado alega que este caso está cubierto por la excepción relativa a las acciones hereditarias a que alude el segundo párrafo del inciso 5 del artículo 1348 del Código Civil. Esta excepción no cubre la adquisición por los albaceas de los bienes que le han sido confiados. Scaevola, op. cit., ed. 1906, tomo XXIII, pág. 422 .

del presente caso la prueba demuestra diáfanamente que los bienes fueron confiados al demandado José Américo no por el hecho de haber sido designado albacea por su extinto hermano, sino porque desde hacía más de veinticinco años venía administrándolos para beneficio de su padre, primero, y de la sucesión luego en virtud "de un acuerdo de familia". El condominio perteneciente a la parte demandante no llegó a su administración por razón del fallecimiento del testador. Ya lo estaba, aún en vida de éste. Y esto es más definitivo cuando se considera que no medió una aceptación formal del cargo, con la consiguiente formalización del inventario, [11] sino meramente una aceptación tácita, según las disposiciones del artículo 820 del Código Civil (31 L.P.R.A. sec. 2517). [12]

## II

Invocando el caso de *Escalona* v. *Registrador*, 9 D.P.R. 581 (1905) el tribunal de instancia concluyó que es nula la venta hecha por la legataria Ana Carmen Piazza a su padre demandado, por el fundamento de que "si el legado no fuere de cosa

---

[11] La aceptación expresa del cargo se rige en cuanto a sus requisitos formales, por el artículo 597 del Código de Enjuiciamiento Civil (32 L.P.R.A. sec. 2571), que dispone:

"Todo albacea que acepte el nombramiento hecho a su favor en un testamento, deberá entregar al funcionario en cuya oficina se halla protocolado el testamento, una aceptación del cargo por escrito, acompañada de un juramento, también por escrito, comprometiéndose a cumplir del mejor modo que le fuere dable, sus obligaciones como albacea, sin lo cual no podrá hacerse cargo de los bienes del finado. La sala del Tribunal Superior de la última residencia del finado o del lugar en que radican sus bienes, mediante la presentación de una certificación del notario u otro funcionario competente, en que conste haberse archivado dicha aceptación y juramento oficial, expedirá cartas testamentarias a favor del albacea, las cuales constituirán prueba de su autoridad. Tan pronto como un administrador haya prestado su fianza y juramento oficial, el juez o tribunal que lo hubiere nombrado expedirá a su favor cartas de administración bajo su sello, en testimonio de su autoridad."

[12] Dicho artículo lee como sigue:

"El albaceazgo es cargo voluntario, y se entenderá aceptado por el nombrado para desempeñarlo si no se excusa dentro de los seis días siguientes a aquél en que tenga noticia de su nombramiento o si éste le era ya conocido, dentro de los seis días siguientes al en que supo la muerte del testador."

específica y determinada, sino genérico o de cantidad, el legatario no puede disponer de parte determinada en los bienes de la herencia".

En el citado recurso gubernativo una hija natural reconocida del testador había sido designada como legataria en una mitad del quinto de los bienes de su padre, y solicitó se inscribiera a su favor la décima parte del valor de un bien específico del caudal. Al confirmar la nota denegatoria, se sostuvo que no habiéndose practicado la partición del caudal testamentario, la legataria carecía de acción para pedir la inscripción a su favor de determinados bienes de la herencia máxime cuando aún no consta si liquidada ésta resultaría algún sobrante, después de pagadas las deudas, para distribuir entre los herederos y los legatarios de parte alícuota.

No obstante, el rigor de esta doctrina fue notablemente atemperado al decidirse catorce años después el caso de *Capó* v. *Fernández*, 27 D.P.R. 715 (1919), en donde después de hacer una amplia exposición sobre los precedentes locales y españoles sobre la necesidad de una partición previa para lograr la inscripción de un condominio indiviso a favor de un heredero en determinada finca del caudal, dijimos que se le había dado "demasiado extensión en muchos casos concretos" (pág. 723), y limitamos su alcance porque su aplicación estricta "hacía imposibles en la práctica reclamaciones verdaderamente justas" (pág. 725). El ámbito de su vigencia fue circunscrito a aquellos casos en que se reclaman "bienes aislados, deslindados, separados, procedentes de una herencia pero adjudicados ya a determinado heredero", e indicamos que "el título de heredero es bastante cuando lo que se pide es que se reconozca . . . en los bienes de la herencia el derecho que la misma ley le asigna." Sustitúyase en el presente caso la designación del derecho por la voluntad del finado expresada en testamento y obtendremos el mismo resultado.(13) En el

---

(13) El Tribunal Supremo de España admite en su sentencia de 14 de junio de 1898 (84 Jurisp. Civil 508) que un legado del tercio, que es una parte alícuota, se considere como sucesión universal. Al efecto declaró que

presente caso lo que en realidad se transfirió por la legataria a su padre fue un derecho indeterminado en un bien específico del caudal, y como bien apunta el abogado de éste en su alegato, sujeto quizás al conflicto que pueda surgir cuando se efectúe la partición. (14)

Sin embargo, tal conflicto es más aparente que real, porque fueron los propios demandantes quienes dieron configuración y contenido específico al derecho de la legataria sobre la hacienda Concepción, ya que comparecieron a transferir dos tercios del condominio que en dicho inmueble pertenecían al testador Alejandro Antonio, y sólo *posteriormente* es que la legataria, indudablemente inducida por este reconocimiento de la extensión de su participación como del tercio restante del condominio, lo cede mediante la escritura que ahora se pretende anular. Ciertamente los intereses de la justicia y el trato justo (*fair play*) no se verían mejor servidos si accediéramos a lo solicitado por el mero incumplimiento del requisito de la previa práctica de una partición mediante la cual se haga entrega por la heredera a la legataria de determinada porción o bienes en pago de su legado. Como cuestión de hecho resolvemos que la actuación de las demandantes que hemos reseñado equivalió a la entrega, si ésta era necesaria.

---

el legado del tercio, "como toda disposición testamentaria relativa a la universalidad de la herencia, ha de formarse después de cumplidas las cargas de la herencia misma." Véase, además, la sentencia de 16 de octubre de 1940, que al considerar los conceptos de heredero y legatario de parte alícuota se refiere a "sus múltiples aspectos de coincidencia por la nota común que lo preside, *como sucesores* a título de atribución de bienes indeterminadamente". No es necesario resolver esta cuestión en el presente caso, y además, ello no alteraría, sino que ratificaría el resultado a que hemos llegado para la disposición del mismo. Véase, *Díaz Cruz, Los Legados*, ed. Reus (1951), págs. 482–491.

(14) De los autos no surge claramente que en adición a la estancia Concepción el caudal consista de otros bienes. Existen referencias a "la finca de abajo" y el propio demandado presentó en evidencia la contestación presentada por él en un pleito de división de comunidad iniciado por su hermano Alejandro Antonio—causante de las demandantes—en la cual se describen otros bienes. Podríamos quizás deducir que la participación de dicho causante en los bienes descritos fue también transmitida a sus herederos.

Lo expuesto anteriormente nos releva de la consideración del tercer error señalado.

*Por los fundamentos expuestos se revocará la sentencia dictada por el Tribunal Superior, Sala de Ponce, en 18 de octubre de 1956.*

El Juez Presidente Sr. Negrón Fernández y el Juez Asociado Sr. Hernández Matos no intervinieron.