*In re* EDWIN W. BELÉN TRUJILLO, querellado.

*Número:* CE-85-526          *Resuelto:* 28 de junio de 1991

Rafael Ortiz Carrión, Procurador General, Norma Cotti Cruz, Subprocuradora General, Rosa Negrón de Quiñones e Iván F. Fuster, Procuradores Generales Auxiliares, abogados de la Oficina del Procurador General; Rubén Rivera Ramos, abogado del querellado; Edwin W. Belén Trujillo, pro se.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitió la opinión del Tribunal.

I

El 1ro de agosto de 1985 la Oficina del Procurador General presentó una querella contra el Lcdo. Edwin W. Belén Trujillo en la cual alegó que éste había incurrido en conducta inmoral e impropia al comparecer como testigo instrumental en la Escritura Núm. 270 sobre compraventa, otorgada el 10 de octubre de 1955 ante el notario José R. Fournier Grau,(1) sin conocer personalmente al finado Obdulio Correa Rodríguez y cuya firma fue falsificada por el notario Fournier.

Posteriormente, el 21 de febrero de 1986, el Procurador General presentó una querella enmendada en la cual le imputó al querellado *que, mientras éste cursaba su tercer año en derecho, intervino como testigo instrumental* en el otorgamiento de la Escritura Núm. 270, autorizada por el notario José R. Fournier el 10 de octubre de 1955, sin conocer personalmente a Obdulio Correa Rodríguez.(2) *Se le imputó* al querellado el *haber incurrido en conducta inmoral e impropia fundada en su silencio*

---

(1) Por esos hechos el abogado-notario José R. Fournier Grau fue desaforado de la profesión legal. *In re Fournier*, 114 D.P.R. 255 (1983).

(2) Para una exposición de los hechos que culminaron en estos litigios, véase *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172 (1985).

posterior al otorgamiento sobre *la ilegalidad de la transacción notarial en la que intervino como testigo instrumental.* Dicha conducta constituyó, a juicio del Procurador General, una violación al Canon 38 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX.

El abogado querellado contestó la querella enmendada y, posteriormente, presentó una Moción Solicitando Desestimación de Querella Enmendada, la cual fue declarada sin lugar. Luego de celebrarse la vista y de que los partes sometieran la prueba testifical y documental pertinente, el Comisionado Especial, Lcdo. Waldemar Del Valle López, encontró probados los siguientes hechos, *con los cuales está conforme la Oficina del Procurador General:*

1. El querellado Edwin Belén Trujillo fue admitido al ejercicio de la profesión de Abogacía el 27 de septiembre de 1956 de acuerdo con una certificación expedida por el Sr. Bruno Cortés Trigo, Secretario General del Tribunal Supremo de Puerto Rico, el día 6 de febrero de 1987.

2. Para el 10 de octubre de 1955 se otorgó en Bayamón, ante el Notario Público José R. Fournier, la escritura número 270 sobre Compraventa y en virtud de la cual don Obdulio Correa y su esposa doña Carmen Sánchez vendieron a favor de doña Carmen Belén Correa Sánchez una finca urbana, radicada en el Reparto Correa de Bayamón, por precio de CINCUENTA MIL QUINIENTOS DOLARES ($50,500.00). En dicha escritura comparecen como *testigos instrumentales* Edwin Belén Trujillo y Juan Quirós Hernández.

3. El 13 de abril de 1984 el Hon. Juez Superior Enrique Rivera Santana, del Tribunal Superior, Sala de Bayamón, dictó sentencia en el caso civil número CS 81-3530, Obdulio Correa Sánchez y otros v. Antonio López Jiménez y otros, sobre Acción Declaratoria, Re[iv]indicación y División de Comunidad, expresándose en la determinación de hecho número 26, lo siguiente:

"En esta escritura 270, en la que *el notario falsificó la firma del finado Obdulio Correa Rodríguez,* comparecieron como testigos instrumentales los abogados Edwin Belén Trujillo y Juan Quirós Hernández."

4. Don Obdulio Correa falleció el 2 de noviembre de 1955.

5. El notario en la referida escritura, don José R. Fournier Grau, falleció el 11 de julio de 1985.

6. Entre las defensas afirmativas que levanta el querellado alega en el párrafo duodécimo lo siguiente:

"DUODECIMO: Que la firma que aparece como del Querellado en la Escritura #270, tiene ra[s]gos que se parecen a como él firmaba para la fecha del 10 de octubre de 1955, y ra[s]gos, que no se parecen, por lo que no podemos negar que esa sea la firma del querellado, ni afirmar que lo sea; debido al tiempo transcurrido de treinta (30) años."

Posteriormente, en la vista celebrada se alegó que él no recordaba haber firmado como testigo en la referida escritura número 270.

Sobre si la firma que aparece en la escritura número 270 es o no es del querellado hubo prueba de ambas partes.

La Oficina del Procurador General presentó como testigo al Sr. Evaristo Alvarez Ghigliotti, quien trabaja en el Instituto de Ciencias Forenses de Puerto Rico en el campo de Documentos Forenses y declaró que examinó la firma de Edwin Belén Trujillo que aparece en la escritura número 270, la que aparece en una carta de 31 de agosto de 1984 dirigida al Procurador General, otra firmada por Edwin Belén Trujillo en 17 de enero de 1985 dirigida al Procurador General y examinó ocho o nueve documentos firmados por Edwin Belén Trujillo en 1956 y los cuales se encuentran en el expediente que del Lcdo. Edwin Belén Trujillo se mantiene en el Tribunal Supremo de Puerto Rico por su condición de abogado. En base a su estudio y los rasgos y factores de las firmas, no tiene duda de que la firma que aparece en la escritura número 270 es la del Lcdo. Edwin Belén Trujillo. Entre esos factores para llegar a esa conclusión, están los siguientes:

(a) Factor del movimiento que se subdivide en el impulso de la escritura, ritmo, consistencia, estabilidad, como se inician los trazos, como terminan y si tiene adornos.

(b) Factor de destreza que incluye la proporción, inclinación, alineamiento, presión, velocidad y los ángulos de la escritura; y

(c) Marcas diacríticas.

El querellado declaró que en relación a la firma que aparece en la escritura número 270 no puede decir si es o no su firma [porque] nota diferencias en los rasgos.

*Luego de analizar toda la prueba presentada no tenemos duda alguna que la firma que aparece en la referida escritura número 270 es la del Lcdo. Edwin Belén Trujillo.*

7. Se le imputa al querellado que *"mientras cursaba su tercer año en la Escuela de Derecho de la Universidad de Puerto Rico, como testigo instrumental* intervino en el otorgamiento de la Escritura

Número 270 por el entonces abogado Notario José R. Fournier, el 10 de octubre de 1955 *sin conocer personalmente* al finado Obdulio Correa Rodríguez" . . . .

Surge claramente de la escritura número 270 que *el querellado no firmó como testigo de conocimiento y sí como testigo instrumental.* Para la fecha en que se otorgó la escritura número 270 estaba vigente en Puerto Rico la "Ley Para Regular el Ejercicio de la Profesión Notarial en Puerto Rico" aprobada el 8 de marzo de 1906.

En la Sección 13 y 15 de la referida ley se disponía lo siguiente:

"Sección 13.— Ninguna escritura pública, salvo lo que se dispone en esta ley en casos especiales, podrá ser autorizada por el Notario, sin la presencia de dos testigos . . . ."

"Sección 15.— La presencia de los testigos se requiere para la lectura, consentimiento y firma, que tendrá lugar en un solo acto."

En la Sección 16 de la misma ley se expresa los siguiente:

"Sección 16.— Los notarios darán fé en los instrumentos públicos de que conocen a las partes, o de que *se han asegurado de su conocimiento por el dicho de los testigos instrumentales, o de otros dos que los conozcan,* y que se llamarán testigos de conocimient[o"] . . . .

Independientemente de que para la fecha en que se otorga la escritura número 270 el querellado era un estudiante de derecho, *el Lcdo. Belén Trujillo firmó en la referida escritura como testigo instrumental,* el cual se requería para la lectura, consentimiento y firma del documento, y no como testigo de conocimiento. *Al firmar como testigo instrumental no tenía que conocer personalmente al finado Obdulio Correa Rodríguez.*

El propio querellado acepta que él *no conocía personalmente* al Sr. Obdulio Correa Rodríguez pero *sabía qui[é]n era.*

*Concluímos que la prueba no establece el cargo que se le imputa al querellado, especialmente cuando para el año 1955 el Lcdo. Belén Trujillo ni siquiera era abogado y como hemos expresado anteriormente, el querellado no compareció como testigo de conocimiento y sí como testigo instrumental.*

8. Se le imputa, en adición, al querellado el cargo de "haber incurrido en conducta inmoral e impropia *basada en su silencio no explicado hasta el presente,* sobre la ilegalidad de la transacción notarial, en que como testigo instrumental intervino, incidente que ha sido objeto de conocidas controversias judiciales de conocimiento público" . . . .

El Código de Etica Profesional aprobado por el Honorable Tribunal Supremo el 24 de diciembre de 1970 y en su Sección 38 (T.

4 Ap. IX) en la parte pertinente dispone: ". . . En su conducta como funcionario del tribunal, deberá interesarse en hacer su propia y cabal aportación hacia la consecución de una mejor administración de la justicia. Tal participación conlleva necesariamente asumir posiciones que puedan resultarle personalmente desagradable[s] pero que redundan en beneficio de la profesión, tales como: *denunciar valientemente, ante el foro correspondiente, todo tipo de conducta corrupta y deshonrosa de cualquier colega o funcionario judicia[l"]* . . . .

*¿Incurrió el querellado en conducta inmoral o impropia basada en su silencio no expresado hasta el presente? En base a la prueba presentada entendemos que no.*

La prueba de la Oficina del Procurador General nada aporta para sostener este cargo. Por el contrario el querellado declaró que se enteró de la situación por una carta que le envió el Lcdo. Roberto Schmidt Monge, Procurador General, de fecha 9 de agosto de 1984 en la que le concede quince (15) días para que expresara su versión en cuanto a lo que se le exponía en la referida carta. Esta carta fue contestada el 31 de agosto de 1984 en la cual el querellado daba la versión suya de lo ocurrido. Reiteró en varias ocasiones que nada supo de los casos resueltos relacionados con el Sr. Obdulio Correa ya que viajaba constantemente a Sur América en negocios ajenos a la profesión, la cual practicaba muy poco.(3)

*De toda la prueba presentada determinamos que el querellado no tenía conocimiento de los procedimientos en el Tribunal ni de las decisiones judiciales por lo que nada tenía que expresar.*

Determinar que el querellado se enteró o se pudo enterar posteriormente de los procedimientos judiciales o de las decisiones de los tribunales respecto a la conducta del entonces abogado-notario José R. Fournier, que le permitiera dar cumplimiento al Canon 38, *es especulativo. Estos hechos surgen alrededor de veinticinco (25) años después de el querellado haber comparecido como testigo en la escritura número 270.* Esa no fue la única escritura del entonces Lcdo. Fournier donde el querellado compareció como testigo instrumental. De la prueba surge que el querellado, conjuntamente con otras personas, era un testigo muy común en las escrituras que se otorgaban ante el entonces Lcdo.

---

(3) Con relación a sus gestiones de negocio y el conflicto de éstas con su práctica privada, este Tribunal suspendió al Lcdo. Edwin W. Belén Trujillo por el término de dieciocho (18) meses del ejercicio de la abogacía. *In re Belén Trujillo*, 126 D.P.R. 743 (1990).

Fournier. *A cambio de permitirle usar la biblioteca profesional del referido Notario, utilizaba como testigos instrumentales tanto al querellado como a otros que iban a la oficina de él.* El querellado nunca fue citado a declarar ante un Tribunal ni fue requerido por persona alguna para declarar sobre su firma en la escritura número 270. No había ningún hecho especial para que el querellado tuviese que recordar lo relativo al otorgamiento de la escritura número 270. (Énfasis suplido y en el original.) Informe del Comisionado Especial y determinaciones de hecho, págs. 2–7.

El caso ante nos plantea dos (2) situaciones relacionadas entre sí pero distintas. La primera tiene que ver con la facultad de este Tribunal para investigar y disciplinar a abogados por actos u omisiones cometidos antes de ser admitidos al ejercicio de la profesión de abogado, lo cual en un contexto más amplio implica pasar juicio sobre el carácter y la aptitud del abogado antes de su admisión (*character and fitness*). La segunda tiene que ver con si el licenciado Belén Trujillo violó el Canon 38 del Código de Ética Profesional, *supra*, por guardar silencio sobre la ilegalidad de la transacción notarial en la que intervino como testigo instrumental, una vez advino a formar parte de la profesión.

II

Examinemos la primera situación.

No cabe duda que este Tribunal tiene facultad inherente para reglamentar la admisión y la remoción de una persona del ejercicio de la abogacía. *García O'Neill v. Cruz,* 126 D.P.R. 518 (1990); *In re Carreras Rovira y Suárez Zayas,* 115 D.P.R. 778 (1984); *In re Rojas Lugo,* 114 D.P.R. 687 (1983); *In re Roldán González,* 113 D.P.R. 238 (1982); *In re Ríos,* 112 D.P.R. 353 (1982); *In re Rodríguez Torres,* 104 D.P.R. 758 (1976); e *In re Rodríguez Torres,* 106 D.P.R. 698 (1978).

Como parte de dicha potestad, el Tribunal también tiene facultad inherente para investigar y tomar las determinaciones correspondientes sobre el carácter y la aptitud (*fitness*) de todo aspirante a la profesión de la abogacía. Esta función ha sido

delegada en una comisión de reputación creada por este Tribunal mediante reglamento al efecto para atender las solicitudes de los aspirantes al ejercicio de la abogacía. 4 L.P.R.A. Ap. XVII-A.

■ El aspirante debe acreditar en su solicitud que posee "buena reputación", y la Comisión de Reputación de Aspirantes al Ejercicio de la Abogacía (en adelante Comisión de Reputación) pasa juicio sobre ello y le acredita, a su vez, a este Foro que el aspirante posee el carácter y la "buena reputación moral" para ejercer la profesión de abogado (4 L.P.R.A. sec. 721 y ant. sec. 731).

■ La acreditación que hace la Comisión de Reputación a este Foro es una recomendación que goza de una presunción de corrección. La Comisión de Reputación tiene su reglamento para regir su funcionamiento y está constituida por cinco (5) miembros especializados, con poderes para evaluar, investigar y determinar el carácter y la reputación del aspirante. 4 L.P.R.A. Ap. XVII-A, R. 1(b)(1).

■ La Comisión de Reputación es un valioso instrumento con que cuenta este Tribunal en el descargo de nuestra función de admitir aspirantes al ejercicio de la abogacía. Sus dictámenes merecen gran deferencia por parte de este Tribunal por ser un organismo cuyas decisiones están fundamentadas en la prueba que tiene ante sí sobre la conducta pasada y presente del aspirante. 4 L.P.R.A. Ap. XVII-A, R. 2.

■ Al momento en que el querellado, licenciado Belén Trujillo, solicitó admisión al ejercicio de la profesión ya existía esta comisión y le correspondía a ella, en primera instancia, evaluar la idoneidad moral del aspirante al momento de su ingreso a la profesión legal. La conducta del querellado cuando era estudiante de derecho no fue considerada por la Comisión de Reputación y ésta recomendó favorablemente su solicitud al ejercicio de la profesión legal, cosa que hicimos. No tenemos ante nos prueba de fraude o de engaño a la Comisión de Reputación

por parte del aspirante. 4 L.P.R.A. sec. 734; *In re López*, 15 D.P.R. 265 (1909).

■ Por otra parte, este Tribunal tiene poder inherente para investigar y determinar si la conducta específica de una persona antes de ser abogado puede ser considerada para removerlo como tal, *cuando adviene en conocimiento de ello una vez es abogado, como sucede en el caso de autos*. El Tribunal puede usar el mecanismo de nombrar un comisionado para que investigue y haga recomendaciones sobre el particular; referir el asunto a la Comisión de Reputación, así como utilizar cualquier otro mecanismo que, con las garantías procesales correspondientes, le ayuden a pasar juicio y a tomar una determinación sobre dicha conducta.

■ Establecido lo anterior, se plantea qué normas o criterios debe utilizar este Tribunal para evaluar la conducta de la persona cuando todavía no era abogado. Igual interrogante se le plantea a la Comisión de Reputación cuando evalúa a cada aspirante. Este asunto se le ha planteado a casi todas las jurisdicciones estatales de Estados Unidos.(4)

En síntesis, algunos estados establecen criterios y normas amplias; otros, conductas específicas que pueden reflejar buen o mal carácter y aptitudes; otros señalan factores que nunca deben ser considerados al evaluar a un aspirante.

■ El asunto, obviamente, es inminentemente subjetivo y, como expresó el Juez Frankfurter en *Schware v. Board of Bar Examiners of New Mexico*, 353 U.S. 232 (1957), opinión concurrente, el concepto de carácter moral tiene unos contornos sombríos en vez de precisos (*shadowy rather than precise bounds*). Lo definió así:

> From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor,

---

(4) Para un excelente análisis de los criterios utilizados por los distintos estados, véase D.C. Brennan, *Defining Moral Character and Fitness*, 58 (Núm. 4) The Bar Examiners (1989).

of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as "moral character".

■ Lo primero que debemos señalar es que, como norma general, se presume que todo aspirante tiene un buen carácter y aptitud, a menos que se determine que la conducta pasada o presente causa que una persona razonable crea que éste, si es admitido a la profesión, no podrá y no estará inclinado a actuar en forma *honesta, justa* e *íntegra*. Esos criterios pretenden excluir de la práctica actual o futura de la abogacía a personas que demuestren un *patrón* de actitudes que, evaluados sus *rasgos* de carácter y de personalidad *integralmente*, reflejen una *actitud personal* que las inhabilitan para ejercer la profesión de abogado, ya que lo más probable es que en tal función causen daño a clientes actuales o futuros, obstruyan la administración de la justicia o violen los cánones del Código de Ética Profesional.

■ Un aspirante también puede quedar inhabilitado si incurre en aquella conducta específica intencional que por su naturaleza grave y sus efectos perjudiciales (dentro de las circunstancias del caso) de por sí refleja rasgos de carácter y de personalidad que demuestran que dicha persona no es justa, honesta e íntegra.

A la luz de las normas señaladas anteriormente, examinamos si la conducta específica del querellado da margen a que lo disciplinemos. Sostenemos que no.

Al licenciado Belén Trujillo se le imputó un acto *específico*, *remoto* y *aislado* de un estudiante de derecho que utilizaba una oficina legal mientras cursaba sus estudios en derecho. No existe prueba en autos de que existiera un patrón personal de actitudes que, evaluado integralmente, reflejara una aptitud personal o rasgos de carácter y de personalidad que pudieran causar daños a clientes, a la administración de la justicia o que reflejaran alguna, violación a los cánones del Código de Ética Profesional.

■ La conducta *específica* del licenciado Belén Trujillo, cuando siendo estudiante de derecho actuó como testigo instru-

mental en la Escritura Núm. 270 fue imprudente e *impropia* y no refleja una intención específica de causar perjuicios a terceros.

Sin embargo, dicha conducta específica, examinada a la luz de los parámetros y de las circunstancias particulares aquí expuestas —que ocurrió unos treinta (30) años atrás— no requiere que le demos curso a la querella.

## III

Sobre la segunda imputación de que el querellado violó el Canon 38 del Código de Ética Profesional, *supra*, por guardar silencio sobre la ilegalidad de la transacción notarial en la que intervino como testigo instrumental, no creemos que la prueba refleje que tal sea la situación.

El Canon 38 del Código de Ética Profesional, *supra*, exige, en lo pertinente, que:

> *Canon 38. Preservación del honor y dignidad de la profesión*
> El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia. En su conducta como funcionario del tribunal, deberá interesarse en hacer su propia y cabal aportación hacia la consecución de una mejor administración de la justicia. Tal participación conlleva necesariamente asumir posiciones que puedan resultarle personalmente desagradables pero que redundan en beneficio de la profesión, tales como: *denunciar valientemente, ante el foro correspondiente, todo tipo de conducta corrupta y deshonrosa de cualquier colega o funcionario judicial*; aceptar sin vacilaciones cualquier reclamación contra un compañero de profesión que haya perjudicado los intereses de un cliente; *poner en conocimiento de las autoridades apropiadas todo acto delictivo o de perjurio que ante él se cometiera . . . .* (Énfasis suplido.)

Hemos examinado cuidadosamente la transcripción de evidencia y el informe del Comisionado Especial, y lo que la prueba demuestra es que el querellado no podía divulgar un *hecho aislado* que ocurrió *25 años atrás y que no recordaba.* El

querellado desconocía del pleito instado. Se enteró de la situación en 1984 cuando el entonces Procurador General le apercibe de la misma mediante carta al efecto. Quedó irrefutado, además, que el licenciado Belén Trujillo practicaba muy poco la profesión, puesto que viajaba constantemente fuera de la isla por cuestiones de negocios.

El querellado no tenía por qué saber que se había presentado una demanda en 1981 cuya sentencia se dicta en 1985. Es en 1983 que se le formula al licenciado Fournier la querella a la que se allana, y es en agosto de 1984 que al querellado se le formulan los cargos y se entera de la situación.

El querellado nunca fue citado a declarar a un tribunal ni fue requerido por persona alguna en relación con su firma en la Escritura Núm. 270. No había ningún hecho especial para que el querellado tuviera que recordar lo relativo al otorgamiento de la Escritura Núm. 270.

De hecho, el Dr. José Mercado Romero —Psicólogo Clínico— declaró en calidad de perito que, según su examen del querellado, éste sólo recordaría experiencias *significativas* remotas de *profundo valor anímico* y que fueran *trascendentales.* T.E., págs. 108–109. Fue de opinión que firmar una escritura cuando la persona no es comprador ni contratante no es un hecho significativo, susceptible de ser recordado al cabo de varios años. T.E., pág. 115. Además, la prueba demostró que el querellante tuvo una práctica de la abogacía limitada, dedicándose a otros menesteres.

Por las razones expuestas, *se archiva la querella.*

Los Jueces Asociados Señores Negrón García y Rebollo López emitieron opiniones disidentes.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

"[*H*]*abéis equivocado el camino*. Tomáis la mentira *por VERDAD . . .*". (Énfasis suplido.) Antón Chejov, citado por D.T. Cairnie Corallini, *El juez frente a la verdad y la certeza de su*

*fallo—único camino a seguir,* 1980 (Núm. 853) Rev. Notarial 2041, 2047 (1980).

> Innumerables decisiones antes y después de la aprobación de la Constitución, sostienen ampliamente que ". . . la remoción, al igual que la admisión al ejercicio de la abogacía, es facultad inherente de la rama judicial . . . ." [*In re Pagán,* 71 D.P.R. 761, 763 (1950)]; *In re Andréu Ribas,* 81 D.P.R. 90, 121 (1959); [*In re Liceaga,* 82 D.P.R. 252, 255 (1961)]; *In re Abella,* 67 D.P.R. 229, 238 (1947); *In re González Blanes,* 65 D.P.R. 381, 390–391 (1945); *In re Bosch,* 65 D.P.R. 248, 251 (1945); *In re Arroyo Rivera,* 63 D.P.R. 796, 798 (1944); *Guerrero* v. *Tribunal de Apelación,* 60 D.P.R. 241, 247–252 (1942); *Ex parte Jiménez,* 55 D.P.R. 54 (1939); *In re Tormes,* 30 D.P.R. 267, 268 (1922). La razón fundamental para esta doctrina quedó claramente expuesta en *In re Díaz,* 16 D.P.R. 82, 92 (1910): "[l]a misión de los abogados en la sociedad es altamente noble, pues están llamados a auxiliar a la recta administración de justicia. En ellos confían, no sólo las partes interesadas en los pleitos, sino las cortes mismas." Recientemente reiteramos que "[s]u misión como tal no se limita meramente a representar intereses privados—en este caso los suyos—sino a ser un instrumento leal y eficaz de la administración de la justicia y del orden en nuestra sociedad." *Martínez Rivera* v. *Sears, Roebuck,* 98 D.P.R. 641, 652 (1970). *In re Rodríguez Torres,* 106 D.P.R. 698, 748–749 (1978), opinión disidente.

En esa función rectora e inherente, desde principios de siglo la investigación y determinación respecto al carácter y a la reputación de todo aspirante a la profesión de la abogacía fueron encomendadas a un organismo auxiliador denominado Comité o Comisión de Reputación. Siempre, en su solicitud, todo aspirante debe acreditar que posee, entre otros atributos, "buena reputación moral". Sec. 5 de la Ley de 11 de marzo de 1909 (4 L.P.R.A. ant. sec. 731); Ley Núm. 46 de 22 de junio de 1975 (4 L.P.R.A. sec. 721).

El establecimiento de ese organismo de reputación nunca ha significado una reducción de nuestra jurisdicción "para investigar y juzgar por [nosotros mismos] la conducta del aspirante". *In re Casablanca,* 30 D.P.R. 399, 404 (1922).

Hoy no se cuestiona seriamente la amplitud temporal de esa facultad. Los hechos y las circunstancias *significativas* anteriores

a la admisión, *que afectan adversamente* la reputación moral de un aspirante o un abogado, *son materias susceptibles de ser válidamente investigadas y evaluadas.* La intervención dependerá de la naturaleza y de la gravedad de los actos y sus consecuencias. *A la postre, el Tribunal Supremo no puede ignorar unos hechos que, de haber conocido e investigado la Comisión de Reputación, en su día hubiesen impedido la admisión.* Lo contrario limitaría sustancialmente nuestra responsabilidad de mantener en alto la dignidad y el nombre de los abogados como protagonistas indispensables y auxiliares de la recta administración de la justicia. *In re Ortiz Gilot,* 117 D.P.R. 167 (1986); *In re Siverio Orta,* 117 D.P.R. 14 (1986); *In re Boscio Monllor,* 116 D.P.R. 692 (1985).

En resumen, nuestro inherente poder investigativo y disciplinario se extiende a situaciones acaecidas *antes* del abogado ser admitido al ejercicio de la profesión y *si las mismas están íntimamente relacionadas con las cualidades morales que como profesional se espera y presupone tal admisión.* El "certificado de buena conducta" expedido por la Comisión de Reputación no es impedimento para descargar en ese momento, o posteriormente, nuestra jurisdicción original disciplinaria. *In re Casablanca,* supra, págs. 403–404; *In re López,* 15 D.P.R. 265 (1909). Igual enfoque existe en otras jurisdicciones: Anotación, *Disciplinary Action Against Attorney Based on Misconduct Prior to Admission to Bar,* 92 A.L.R.3d 807; *Stratmore v. State Bar,* 538 P.2d 229 (Cal. 1975); *Gould v. State,* 127 So. 309 (1930).

Este trasfondo doctrinario traza las coordenadas decisorias en el presente asunto. Expongamos sus antecedentes procesales y fácticos.

I

El Procurador General presentó una querella disciplinaria contra el Lcdo. Edwin W. Belén Trujillo. Le imputó haber comparecido como *testigo* instrumental en la Escritura Núm. 270 sobre compraventa, otorgada el 10 de octubre de 1955 ante el

notario José R. Fournier Grau, sin conocer personalmente al finado Obdulio Correa Rodríguez, *cuya firma fue falsificada por el notario Fournier.* La querella fue subsiguientemente enmendada a los fines de exponer que esa conducta aconteció mientras Belén Trujillo cursaba su tercer año en la Escuela de Derecho, imputándole una conducta inmoral e impropia fundada en *su silencio sobre la ilegalidad.* A juicio del Procurador General, dicha conducta infringió el Canon 38 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, que versa sobre la preservación del honor y de la dignidad profesionales.

Oportunamente, el licenciado Belén Trujillo contestó la querella enmendada, negó el cargo y adujo varias defensas afirmativas. Posteriormente, solicitó su desestimación. Declaramos sin lugar dicho pedido y designamos como Comisionado Especial al Lcdo. Waldemar Del Valle López, con la encomienda de recibir la prueba testifical y documental pertinente.

En su informe, dicho Comisionado Especial consignó las siguientes determinaciones de hecho:

1. El querellado Edwin Belén Trujillo fue admitido al ejercicio de la profesión de Abogacía el 27 de septiembre de 1956 de acuerdo con una certificación expedida por el Sr. Bruno Cortés Trigo, Secretario General del Tribunal Supremo de Puerto Rico, el día 6 de febrero de 1987.

2. Para el 10 de octubre de 1955 se otorgó en Bayamón, ante el Notario Público José R. Fournier, la escritura número 270 sobre Compraventa y en virtud de la cual don Obdulio Correa y su esposa doña Carmen Sánchez vendieron a favor de doña Carmen Belén Correa Sánchez una finca urbana, radicada en el Reparto Correa de Bayamón, por precio de CINCUENTA MIL QUINIENTOS DOLARES ($50,500.00). *En dicha escritura comparecen como testigos instrumentales Edwin Belén Trujillo y Juan Quirós Hernández.*

3. El 13 de abril de 1984 el Hon. Juez Superior Enrique Rivera Santana, del Tribunal Superior, Sala de Bayamón, dictó sentencia en el caso civil número CS 81-3530, Obdulio Correa Sánchez y otros v. Antonio López Jiménez y otros, sobre Acción Declaratoria, Re[i-v]indicación y División de Comunidad, expresándose en la determinación de hecho número 26, lo siguiente:

"En esta escritura 270, en la que el notario falsificó la firma del finado Obdulio Correa Rodríguez, comparecieron como testigos

instrumentales los abogados Edwin Belén Trujillo y Juan Quirós Hernández."

4. Don Obdulio Correa falleció el 2 de noviembre de 1955.

5. El notario en la referida escritura, don José R. Fournier Grau, falleció el 11 de julio de 1985.

6. Entre las defensas afirmativas que levanta el querellado alega en el párrafo duodécimo lo siguiente:

"DUODECIMO: Que la firma que aparece como del Querellado en la Escritura #270, tiene ra[s]gos que se parecen a como él firmaba para la fecha del 10 de octubre de 1955, y ra[s]gos, que no se parecen, *por lo que no podemos negar que esa sea la firma del querellado, ni afirmar que lo sea; debido al tiempo transcurrido de treinta (30) años.*"

Posteriormente, en la vista celebrada se alegó que él *no recordaba haber firmado como testigo en la referida escritura número 270.*

Sobre si la firma que aparece en la escritura número 270 es o no es del querellado hubo prueba de ambas partes.

. . . . . . . .

Luego de analizar toda la prueba presentada *no tenemos duda que la firma que aparece en la referida escritura número 270 es la del Lcdo. Edwin Belén Trujillo.*

7. Se le imputa al querellado que "mientras cursaba su tercer año en la Escuela de Derecho de la Universidad de Puerto Rico, *como testigo instrumental* intervino en el otorgamiento de la Escritura Número 270 por el entonces abogado Notario José R. Fournier, el 10 de octubre de 1955 *sin conocer personalmente* al finado Obdulio Correa Rodríguez" . . . .

Surge claramente de la escritura número 270 que el querellado no firmó como testigo de conocimiento *y sí como testigo instrumental.* Para la fecha en que se otorgó la escritura número 270 estaba vigente en Puerto Rico la "Ley Para Regular el Ejercicio de la Profesión Notarial en Puerto Rico" aprobada el 8 de marzo de 1906.

En la Sección 13 y 15 de la referida ley se disponía lo siguiente:

"Sección 13.— Ninguna escritura pública, salvo lo que se dispone en esta ley en casos especiales, podrá ser autorizada por el Notario, sin la presencia de dos testigos. . . ."

"Sección 15.— *La presencia de los testigos se requiere para la lectura, consentimiento y firma, que tendrán lugar en un solo acto.*"

En la Sección 16 de la misma ley se expresa lo siguiente:

"Sección 16.— Los notarios darán fé en los instrumentos públicos de que conocen a las partes, o de que *se han asegurado de su conocimiento por el dicho de los testigos instrumentales, o de otros dos que los conozcan*, y que se llamarán testigos de conocimient[o"]. . . .

Independientemente de que para la fecha en que se otorga la escritura número 270 el querellado era un estudiante de derecho, el *Lcdo. Belén Trujillo firmó en la referida escritura como testigo instrumental, el cual se requería para la lectura, consentimiento y firma del documento*, y no como testigo de conocimiento. Al firmar como testigo instrumental no tenía que conocer personalmente al finado Obdulio Correa Rodríguez.

*El propio querellado acepta* que él no conocía personalmente al Sr. Obdulio Correa Rodríguez *pero sabía qui[é]n era.*

Conclu[i]mos que la prueba no establece el cargo que se le imputa al querellado, especialmente cuando para el año 1955 el Lcdo. Belén Trujillo ni siquiera era abogado y como hemos expresado anteriormente, el querellado no compareció como testigo de conocimiento y sí como testigo instrumental.

8. Se le imputa, en adición, al querellado el cargo de "haber incurrido en conducta inmoral e impropia *basada en su silencio no explicado hasta el presente* sobre la ilegalidad de la transacción notarial, en que como testigo instrumental intervino, incidente que ha sido objeto de conocidas controversias judiciales de conocimiento público" . . . .

El Código de Etica Profesional aprobado por el Honorable Tribunal Supremo el 24 de diciembre de 1970 y en su Sección 38 (T. 4 Ap. IX) en la parte pertinente dispone: ". . . En su conducta como funcionario del tribunal, deberá interesarse en hacer su propia y cabal aportación hacia la consecución de una mejor administración de la justicia. Tal participación conlleva necesariamente asumir posiciones que puedan resultarle personalmente desagradable[s] pero que redundan en beneficio de la profesión, tales como: *denunciar valientemente, ante el foro correspondiente, todo tipo de conducta corrupta y deshonrosa de cualquier colega o funcionario judicia[l"]* . . . .

¿Incurrió el querellado en conducta inmoral o impropia basada en su silencio no expresado hasta el presente? En base a la prueba presentada entendemos que no.

La prueba de la Oficina del Procurador General nada aporta para sostener este cargo. Por el contrario el querellado declaró que se enteró de la situación por una carta que le envió el Lcdo. Roberto

Schmidt Monge, Procurador General, de fecha 9 de agosto de 1984 en la que le concede quince (15) días para que expresara su versión en cuanto a lo que se le exponía en la referida carta. Esa carta fue contestada el 31 de agosto de 1984 en la cual el querellado daba la versión suya de lo ocurrido. Reiteró en varias ocasiones que nada supo de los casos resueltos relacionados con el Sr. Obdulio Correa ya que viajaba constantemente a Sur América en negocios ajenos a la profesión, la cual practicaba muy poco.

De toda la prueba presentada determinamos que el querellado no tenía conocimiento de los procedimientos en el Tribunal ni de las decisiones judiciales por lo que nada tenía que expresar.

Determinar que el querellado se enteró o se pudo enterar posteriormente de los procedimientos judiciales o de las decisiones de los tribunales respecto a la conducta del entonces abogado-notario José R. Fournier, que le permitiera dar cumplimiento al Canon 38, es especulativo. Estos hechos surgen alrededor de veinticinco (25) años después de el querellado haber comparecido como testigo en la escritura número 270. Esa no fue la única escritura del entonces Lcdo. Fournier donde el querellado compareció como testigo instrumental. *De la prueba surge que el querellado, conjuntamente con otras personas, era un testigo muy común en las escrituras que se otorgaban ante el entonces Lcdo. Fournier. A cambio de permitirle usar la biblioteca profesional del referido Notario, utilizaba como testigos instrumentales tanto al querellado como a otros que iban a la oficina de él.* El querellado nunca fue citado a declarar ante un Tribunal ni fue requerido por persona alguna para declarar sobre su firma en la escritura número 270. No había ningún hecho especial para que el querellado tuviese que recordar lo relativo al otorgamiento de la escritura número 270.

Determinamos que de la prueba presentada no surge que el querellado violara las disposiciones contenidas en el Canon 38 antes copiado. (Énfasis suplido y en el original.) Informe del Comisionado Especial y determinaciones de hecho, págs. 2–7.

## II

En su última versión, la opinión mayoritaria suscrita por el Juez Asociado Señor Alonso Alonso acepta finalmente nuestro criterio disidente de que teníamos jurisdicción disciplinaria para examinar la conducta del querellado Belén Trujillo *antes de ser abogado.* Aun así, no podemos refrendarla. Las conclusiones

exculpatorias del informe del Comisionado Especial y la premisa central mayoritaria de que "[n]o tenemos ante nos prueba de fraude o de engaño a la Comisión de Reputación por parte del aspirante" (opinión mayoritaria, pág. 954), *son claramente erróneas*. Veamos.

Los principios deontológicos básicos aplicables no han variado. Desde la promulgación original de los Cánones de Ética Profesional de 19 de julio de *1935* hasta los que rigen al presente, aprobados el 24 de diciembre de 1970, *siempre ha existido el deber perpetuo de preservar y de elevar el honor de la profesión aun a costa del sacrificio personal.* Tampoco ha cambiado sustancialmente el trámite procesal para determinar la buena o la mala reputación de un aspirante a la profesión legal.

Como demostraremos, la Comisión de Reputación que existía al momento de examinar las cualificaciones morales del entonces aspirante Belén Trujillo no pudo considerar el asunto y recomendó favorablemente su solicitud por una sencilla razón: *desconocía su conducta violatoria de la fe testifical.* Esa conducta impropia fue instrumental para que durante más de dos décadas permaneciera en la obscuridad el fraude notarial del licenciado Fournier, perpetrador con la activa participación de las partes y de los testigos instrumentales Belén Trujillo y Juan Quirós Hernández.(1) Aclararla —y poner en su justa perspectiva la solución ética del asunto— es un imperativo. Ello requiere un análisis reflexivo y racional en retrospección.

## III

La prueba revela, *como hechos no controvertidos*, que para 1955 el licenciado Belén Trujillo cursaba su *tercer* año en la Escuela de Derecho de la Universidad de Puerto Rico y utilizaba gratuitamente la biblioteca jurídica en Bayamón del licenciado

---

(1) Juan Quirós Hernández, también estudiante de derecho, eventualmente se graduó de la Escuela de Derecho de la Universidad de Puerto Rico y fue admitido al ejercicio de la abogacía. Fue desaforado el 24 de enero de 1969 por apropiarse indebida e ilegalmente de la cantidad de $3,205.25 perteneciente a sus clientes.

Fournier conjuntamente con otros estudiantes. Entre éstos estaba Quirós Hernández. A cambio de ello, en algunas ocasiones, a ruego del notario Fournier, Belén Trujillo sirvió de testigo en el otorgamiento de varios asuntos notariales.

No hay controversia de que el querellado Belén Trujillo *firmó* como testigo instrumental la Escritura Núm. 270, ideada y falsificada por el notario Fournier. *Al hacerlo, empeñó su palabra y dio fe de que Correa Rodríguez estuvo presente y firmó la escritura, aun cuando estaba muerto.* Aunque Belén Trujillo no tenía amistad con Correa Rodríguez, *"sabía qui[é]n era"* y tenía amistad con su hijo. T.E., págs. 78–79. Según su propia declaración, "podía *identificarlo* en cualquier parte". (Énfasis suplido.) T.E., pág. 81.

Conforme con la sentencia del Tribunal Superior, Sala de Bayamón (Hon. Enrique Rivera Santana, Juez) en el caso Civil Núm. CS 81-3530 de 13 de abril de 1984, la falsificación de esa escritura respondió y se fraguó al tenor de los hechos siguientes:

> Antes de su fallecimiento, don Obdulio Correa Rodríguez había expresado el deseo de que la casa en que vivían, que era parte del Proyecto Correa, ubicado en la parte más alta de los terrenos, por lo que se le dio el nombre de la casa de La Loma, perteneciera a su hija, la codemandante Carmen Belén Correa Sánchez. Conociendo ésta, así como su madre y el Lcdo. Fournier el interés expresado por Correa Rodríguez antes de su fallecimiento convinieron en transferir el título de la propiedad a la hija del finado. *Lo hicieron también otorgando un documento, al que se le dio fecha anterior a la muerte de Correa Rodríguez y en el que se figuró a éste como compareciente. El Notario firmó por el muerto. El documento se tituló de compraventa.* Doña Carmen Sánchez firmó también como vendedora y Carmen Belén Correa Sánchez como compradora. Obdulio Correa Sánchez no se enteró de esta transacción.
>
> El Lcdo. Fournier le adjudicó a este documento el número 270 y le puso fecha de 10 de octubre de 1955. Aunque se firmó después del *2 de noviembre de 1955 (luego* de la muerte de Correa Rodríguez) se le fijó esa fecha para hacer aparecer que la transacción se hizo en vida del padre de la adquirente. Para ello el Notario tuvo que destruir otro documento de su protocolo. Es así porque la escritura 271 otorgada ante el Notario en la misma fecha que se le puso a la

270, se había presentado en el Registro de la Propiedad desde el 14 de octubre de 1955 (hecho estipulado). Otra escritura otorgada ante el mismo Notario bajo el número 284 del 21 de octubre de 1955, se presentó al Registro el 24 de octubre de 1955 (hecho estipulado), esto es, antes de firmarse la 270, a la que se le dio fecha de 10 de octubre de 1955.

En esta escritura 270, en la que el Notario falsificó la firma del finado Obdulio Correa Rodríguez, comparecieron como testigos instrumentales los abogados Edwin Belén Trujillo y Juan Quirós Hernández (Véase *Exhibit* 33 de la parte demandante). (Énfasis suplido y escolios omitidos.)

No puede, pues, desvincularse el querellado Belén Trujillo de estos hechos argumentando que siempre que firmó como testigo "estaban las partes allí presentes". T.E., pág. 67. *Ese aserto es falso e inverosímil por ser físicamente imposible.* Más que una apreciación subjetiva susceptible de ser afectada por el tiempo, estamos ante un evento objetivo. No está sujeto a la natural pérdida de la memoria. Repetimos, Belén Trujillo firmó y dio fe de que presenció, como testigo instrumental, *un acto notarial que no ocurrió, pues Correa Rodríguez había fallecido.*

No se trata, como adujo en la vista evidenciaria, de un simple incidente que no era vital en su vida y que acaeció hace varios años. *Belén Trujillo no era un testigo cualquiera.* A la sazón era mayor de edad, se desempeñaba como maestro de una escuela superior en Bayamón (T.E., pág. 62) y estudiaba tercer año de derecho. Por ende, conocía al menos los principios notariales esenciales referentes o las responsabilidades y funciones de los testigos instrumentales. El Dr. José Mercado Romero —Psicólogo Clínico— declaró a su favor en capacidad de perito. Atestó sobre el nivel de funcionamiento superior (*sobresaliente*) del querellado Belén Trujillo. T.E., pág. 107. Según su examen, testificó que sólo recordaría experiencias significativas remotas de profundo valor anímico y que fueran trascendentales. T.E., págs. 108–109. Opinó que firmar una escritura cuando uno no es comprador ni contratante no es un hecho significativo ni susceptible de ser recordado al cabo de varios años. T.E., pág. 115.

Aun aceptada esta "interesante" tesis psicológica sobre la memoria y la capacidad para recordar, ello no es defensa. *Primero*, aunque el querellado Belén Trujillo no era comprador ni otorgante, no podemos ser incautos y olvidar que su firma fue como testigo en un *acto espúreo*, esto es, *sin que estuviera presente el vendedor Correa Rodríguez*. Recuérdese que Correa Rodríguez, a quien Belén Trujillo "podía identificar en cualquier parte", había *muerto*. Se trata, pues, de un evento, a juicio nuestro, *poco usual y ordinario*. Dada la peculiar naturaleza de ese acto —eminentemente negativo— nos preguntamos si la persona que no acostumbra mentir ni dar fe testifical falsamente, el hacerlo ¿no es precisamente una experiencia "significativa", de "profundo valor anímico" susceptible de ser recordada al cabo de varios años? Y *segundo*, el acto falso fue *con posterioridad* al 2 de noviembre de 1955. El 12 de julio de 1956 —sólo *ocho* (8) meses después— Belén Trujillo suscribió su *Solicitud de Admisión* al ejercicio de la abogacía. Ante estas circunstancias —lo inusitado del acto— es incomprensible la conclusión mayoritaria de que a esa fecha su participación se proyectó como un evento "remoto y aislado", diluido en su memoria.

## IV

Como testigo instrumental, ¿cuáles eran las funciones y obligaciones de Belén Trujillo? A modo de repaso, valga recordar la clásica noción elemental de que un testigo instrumental —a diferencia de los testigos identificadores o corroboradores— son "'[l]os que *presenci[a]n el acto* de la lectura, consentimiento, *firma y autorización de una escritura pública' aseverando con su firma en el instrumento la veracidad del relato notarial*". (Énfasis suplido.) P. Ávila Álvarez, *Estudios de Derecho Notarial*, 3ra ed. rev., Barcelona, Eds. Nauta, 1962, pág. 281. "Cuando intervienen testigos tiene que haber *unidad de acto*. 'Cuando al otorgamiento comparecieren testigos, habrá unidad de acto, lo que bajo su fe notarial hará constar el notario en la escritura'. *Esto significa que todas las partes y los testigos comparecen al*

*mismo tiempo, en el mismo momento ante el Notario para la lectura y firma del documento".* (Énfasis suplido, en el original y escolio omitido.) P. Malavet Vega, *Manual de Derecho Notarial Puertorriqueño*, Santo Domingo, Ed. Corripio, 1988, págs. 97–98. Véase J.M. Sanahuja y Soler, *Tratado de Derecho Notarial*, Barcelona, Ed. Bosch, 1945, T. I, págs. 441–442.

La participación voluntaria de Belén Trujillo como testigo instrumental en el documento falsificado no puede menoscabarse. La función de los testigos instrumentales era y continúa siendo importante. El carácter de esa *intervención* radica, para unos, en que

. . . cumplen una *función de publicidad.* Precisamente el documento notarial es público porque se otorga públicamente, y como no sería práctico hacerlo en la calle, se requiere a dos testigos para que, en representación del pueblo, *presencien el otorgamiento.*

. . . Para otros autores, *los testigos comparten con el Notario la fe pública, que así viene a quedar desdoblada en fe notarial y fe testifical.*

. . . [Y, p]ara otros autores, *los testigos vienen a ayudar a la fe notarial defendiendo a los otorgantes de la posible infidelidad del funcionario* . . . . (Énfasis suplido y escolios omitidos.) Ávila Álvarez, *op. cit.*, págs. 282–283.

Según esta óptica, los testigos instrumentales —en contraste con la participación *activa* de las partes y el notario— "son . . . agentes *pasivos de pura comprobación de la otorgación del acto, que sólo oyen las declaraciones de las partes y la lectura del instrumento por el funcionario, y, asimismo, escrutan a los circunstantes con el objeto de formarse —en último análisis y con clara visión— un exacta juicio del acto del cual son espectadores.* Bajo este aspecto, es *bien palmaria la necesidad* de que tengan un *mínimo de idoneidad,* aptitud que se impone a fin de que en el curso del proceso instrumental *no solamente observen lo actuado* sino que sepan entender, interpretar, que no vengan a tener únicamente un *recuerdo vivo de su presencia al acto, sino que sepan traducir la noción exacta de lo que el acto importó.* De tal suerte, entonces, que los testigos instrumentales son entes pasivos; *en todo caso, su actividad radica en el hecho de*

*suscribir, en unidad de tiempo y acción con las partes y el funcionario, el acto que oyeron y percibieron: auditu et suis, sensibus".* (Énfasis suplido.) A.I. Neri, *Tratado teórico y práctico de derecho notarial,* Buenos Aires, Eds. Depalma, 1970, Vol. 3, pág. 191.

En resumen, *"la presencia de los testigos queda limitada a hacer constar que el negocio jurídico se ha celebrado en la forma y condiciones que resultan del instrumento, y en ningún caso han de salir de su papel pasivo, esto es, de meros testigos, a no ser que se quiera efectuar algo contrario a la moral, o que ellos crean opuesto, porque, siendo voluntaria su misión, pueden negarla cuando estimen que no la deben prestar . . .".* (Énfasis suplido.) Neri, *op. cit.,* págs. 192–193, citando a De Velasco.

## V

Esta normativa aclara el prisma decisorio. Definitivamente, Belén Trujillo, al voluntariamente aceptar intervenir como testigo a solicitud del licenciado Fournier —en lo que atañe a la Escritura Núm. 270— no cumplió con los deberes que le imponía la función de testigo instrumental. *Con su firma suscribió un documento sobre un acto que en unidad de tiempo nunca se llevó a cabo ni presenció.* Correa Rodríguez, una de las partes supuestamente comparecientes, *estaba muerto.* Al hacerlo, su intervención fue *determinante* para que el notario consumara *la falsificación* de la escritura.

Frente a estos hechos, no puede el licenciado Belén Trujillo escudarse en el transcurso de los años y menos ignorar lo sucedido. Independientemente de que tuviera o no conocimiento de los litigios posteriores que culminaron con el descubrimiento del fraude notarial, *lo cierto es que al suscribir como testigo instrumental la Escritura Núm. 270 transcendió el marco de ente pasivo.* La mayoría del Tribunal lo excusa fundamentándose en que era "un estudiante de derecho que utilizaba una oficina legal mientras cursaba sus estudios en derecho". Opinión mayoritaria, pág. 955. ¿Desde cuándo esa circunstancia es eximente

para violentar principios básicos éticos y legales? ¿Cómo puede la mayoría incurrir en semejante desvalorización?

Es evidente que, al aceptar Belén Trujillo la petición del notario Fournier, conocía o debió saber *la impropiedad del requerimiento.* Así lo reconoce la mayoría, quien adicionalmente la tacha de "imprudente". Opinión mayoritaria, pág. 956. Su conducta inicial impropia y el silencio subsiguiente propiciaron que dicho notario pudiera falsificarla y que, por muchos años, ese acto espúreo permaneciera oculto hasta que finalmente, después de unos intensos litigios judiciales, aflorara la verdad. Ese silencio *no es atribuible* a la falta de memoria ni al factor tiempo; comenzó desde el mismo instante en que firmó como testigo y dio fe de una transacción notarial que *no presenció* y que *nunca se realizó.*

Contrario al sentir mayoritario, no podemos condonar esa conducta y despachar el asunto con simplemente afirmar que "no engañó" a la Comisión de Reputación. El sentido común nos marca otra ruta. Lo menos que podemos concluir es que de haber la Comisión de Reputación conocido esos hechos, su certificación no hubiese prosperado. *Hay situaciones que el tiempo no borra.* Evaluada su conducta a través del crisol de un estudiante de tercer año de derecho —y la gravedad de su acto— decretaríamos que la suspensión provisional de dieciocho (18) meses, impuesta por violar el Canon 21 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX —conflicto de intereses— en *In re Belén Trujillo,* 126 D.P.R. 743 (1990), debe ser *indefinida. Todavía continúa mintiendo.*

—O—

Voto disidente emitido por el Juez Asociado Señor Rebollo López.

No podemos suscribir la opinión mayoritaria emitida en el presente caso por el Tribunal. La misma constituye un premio o galardón a una persona que con sus actos, pasados y presentes, ha demostrado no sólo que no merecía haber sido admitido a la profesión, sino que no es acreedor de continuar siendo abogado.

Independientemente de que la querella radicada por el Procurador General de Puerto Rico esté principalmente basada, como

sostiene la Mayoría, en "un acto *específico, remoto y aislado* de un *estudiante de derecho* que utilizaba una oficina legal *mientras cursaba sus estudios en derecho*" —(énfasis suplido y en el original) opinión mayoritaria, pág. 955— *lo cierto es que una vez ya siendo abogado, esta persona continúa incurriendo en conducta impropia que lo incapacita, a nuestro juicio, para ser abogado.*

Como claramente surge del informe que rindiera el Comisionado Especial que este Tribunal designara para intervenir en el presente asunto, *dicho Comisionado llegó, a base de la prueba que desfilara ante él, a la conclusión de que "la firma que aparece en la referida escritura número 270 es la del Lcdo. Belén Trujillo".* Informe del Comisionado Especial y determinaciones de hecho, pág. 4. Ello no obstante, el querellado Belén Trujillo —*ya siendo abogado*— alega no recordar haber firmado como testigo en la referida Escritura Núm. 270; esto es, *no reconoce como suya la firma que aparece en dicho instrumento público.*

A nuestra manera de ver las cosas, su *deshonestidad* al así actuar —ya siendo abogado— es *razón suficiente* para no permitirle que desempeñe la honrosa profesión de abogado.

Es por ello que disentimos.